## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| | ) | |
| HLDS (B) STEEL SDN BHD AND | ) | |
| HLD CLARK STEEL PIPE CO., INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Ct. No. 21-00638 |
| | ) | |
| UNITED STATES | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WELDED TUBE USA, INC., | ) | |
| WHEATLAND TUBE COMPANY, | ) | |
| AND VALLOUREC STAR L.P., | ) | |
| | ) | |
| Defendant-Intervenors | ) | |
| | ) | |

_____

### PLAINTIFFS' OPPOSITION TO DEFENDANT-INTERVENORS' MOTION TO STAY PROCEEDINGS

On behalf of HLDS (B) Steel Sdn Bhd ("HLDSB") and HLD Clark Steel Pipe Co., Inc. ("HLD Clark") (together: "HLD Companies"), we respectfully oppose Defendant-Intervenors Welded Tube USA, Inc., Wheatland Tube Company, and Vallourec Star L.P.'s motion to stay proceedings in this litigation. *See* Defendant-Intervenors' Motion to Stay Proceedings (March 24, 2022), ECF Doc. No. 26.

Defendant-Intervenors are correct that Plaintiffs challenge the U.S. Department of Commerce's ("Commerce") decision to compare the HLD Companies' investment levels, production facilities, and operations for the production of oil country tubular goods to those of integrated steel mills. *Id.* at 2-3 and Complaint (January 24, 2022) at 5 and Count 1, ECF Doc. No. 8. Defendant-Intervenors err, however, in assuming that the decision of the U.S. Court of Appeals for the Federal Circuit in *Al Ghurair Iron & Steel LLC v. United States*, Fed. Cir. Appeal No. 22-1199 will "dictate" the outcome of this appeal.

Plaintiffs are not familiar with the administrative record of the *Al Ghurair* case, which is possibly quite different from the record upon which Plaintiffs have based their appeal to this Court. In any event, differences in the production of the merchandise at issue in *Al Ghurair*, corrosion-resistant steel products ("CORE"), and Plaintiffs' production of oil country tubular goods ("OCTG") necessitate a different analysis as to whether Commerce's decision was arbitrary and capricious and not supported by substantial evidence. Moreover, the U.S. industry that the U.S. International Trade Commission ("ITC") found to be injured by reason of imports of OCTG from China into the United States is

different from the U.S. industry injured by CORE from China.

In its injury investigations, the ITC always describes the production process of the subject merchandise as reported by the relevant U.S. industry members.  According to the information provided by the U.S. CORE industry, the production of CORE products begins with the making of steel.  The ITC states:

> Steel for the substrate of corrosion resistant steel may be produced by several methods. The two common methods are the electric-arc furnace method, which generally uses cold metallic raw materials, including scrap, cold pig iron, and direct-reduced iron as input, and the blast furnace/oxygen furnace method, which uses iron ore, coke, and smaller amounts of scrap or other cold metallic materials. After melting, steel is cast as a semifinished steel product called "slab." Slabs are heated to hot-rolling temperature and rolled on a hot-strip mill. The hot- rolled product is reeled into a coil for further handling and processing.
>
> Hot-rolled steel is uncoiled and processed through a "pickle line" in which it passes through vats of acid to remove oxide scale from the hot-rolling process. Next, the steel is processed through a cold-rolling mill to reduce its thickness to the ordered final thickness. The cold-rolling process hardens the steel so that it must be softened by thermal processing (annealing) in subsequent operations

U.S. International Trade Commission, *Certain Corrosion-Resistant Steel Products from China, India, Italy, Korea, and Taiwan,* Inv. Nos. 701-TA-534-537 and 731-TA-1274-1278 (Final), USITC Publ. 4629 (July

2016) at I-18.  The U.S. CORE industry is mostly composed of large U.S. integrated steel mills.  For instance, among the petitioners in the CORE antidumping and countervailing duty investigations were United States Steel Corporation, Nucor Corporation, Steel Dynamics Inc., ArcelorMittal USA LLC, and AK Steel Corporation ("AK Steel").  *Id.* at 3.

In contrast, the U.S. manufacturers of welded OCTG, including Defendant-Intervenors in this case, are downstream mills that purchase hot-rolled steel sheets, usually in coils.  The mills' production of OCTG therefore begins with the forming of the steel sheets into tubes.  The ITC reports;

> The manufacturing process for casing and tubing includes forming and finishing phases. . . .
>
> **Forming phase**
>
> OCTG mills manufacture casing and tubing either by the seamless process or by the electric-resistance-welding ("ERW") process, a lower-cost method than the seamless process, depending on the service requirements. By contrast, mills manufacture coupling stock for OCTG couplings exclusively through the seamless process.
>
> . . .
>
> Welded OCTG is manufactured from steel sheet in coil form (figure I-5). The steel sheet is slit to the width that corresponds to the desired diameter of tube. The slit sheet

passes through a series of rollers while at ambient temperature and forms a tubular shape. The edges are then heated by electric resistance and welded together by heat and pressure, without the addition of filler metal. The welding pressure causes some of the metal to be squeezed from the welding joint, forming a bead of metal on the inside and outside of the tube. This bead, or welding flash, is usually trimmed from both the outside and the inside surfaces.

### Finishing phase

After the forming phase, the pipe body is heat-treated, and its ends upset, threaded and coupled, as needed. U.S. pipe mills typically are equipped with the facilities necessary to perform these processes. . . .

U.S. International Trade Commission, *Oil Country Tubular Goods from China,* Investigation Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Publ. 5136 (Nov. 2020) at I-14 – I-18.

Accordingly, whereas it may have appeared reasonable to the Court to compare the manufacture of CORE with the manufacturing facilities and processes of integrated steel mills, Plaintiffs believe that Commerce's decision to compare the manufacture of OCTG with the steel-making facilities and processes of *integrated* steel mills was arbitrary and capricious.  Moreover, the ITC investigated only whether U.S. OCTG producers, who are not integrated steel mills, were injured by reason of imports of OCTG from China.  Commerce's circumvention

decision underlying this instant case is therefore not covered by the ITC's injury investigation.

Another unique feature of the underlying ITC final determinations is that in OCTG, Plaintiffs were specifically excluded from the injury findings (despite a full investigation of HLD Clark Philippines by Commerce for dumping) because their exports were de minimis.  We see no evidence of that fact pattern in the CORE ITC investigations.

Finally, the administrative record in this instant case does not support Commerce's circumvention findings. The industry, processing steps, complexity and value-added analysis is all different and favor Plaintiffs in the instant matter, as will be elaborated upon in briefing. Moreover, as noted just above, this self-initiated action by Commerce appears to be a form of "agency payback" for the Commission's audacious decision to exclude Plaintiffs' countries from its injury findings for their de minimis role in exports of OCTG to the United States.  Such exports remain de minimis yet Commerce has pulled them into the Chinese OTCG Orders nonetheless, contrary to the statutory

scheme.

Accordingly, Defendant-Intervenors have not shown that the
CAFC's decision in *Al Ghurair* will "dictate" the outcome of this
litigation; nor have Defendant-Intervenors shown that they would be
irreparably harmed absent a stay.  In this case, both the HLD
Companies' interest and the public interest lie in the conduct of the
action without undue delay with an expeditious and judicious
conclusion.

The Court must "weigh and maintain an even balance between
competing interest when deciding whether a stay is appropriate."
*Nexteel Co., Ltd. v. United States*, No. 20-03898, 2022 Ct. Intl. Trade
LEXIS 4, at *4-5 (Ct. Int'l Trade Jan. 21, 2022).  If there is "'even a fair
possibility that [a] stay' will do damage to the opposing party, the
movant 'must make out a clear case of hardship or inequity in being
required to go forward[.]'" *Id.* citing to *Landis v. North American Co.*,
299 U.S. 248, 255 (1936).

Defendant-Intervenors have not shown any hardship or inequity
that would follow if the case proceeded in its normal course.  Plaintiffs,

however, will be materially injured in their ability to continue their

normal business operations by any delay in this proceeding.  A stay also

does not serve the public interest of "just, speedy, and inexpensive

determination of every action and proceeding," the Court's paramount

obligation.  *See* USCIT R. 1.

As this Court decided in *Nexteel*, "{g}enerally, speculative claims

regarding the possible impact of a future decision on the disposition of

the case at bar do not suffice to warrant a stay." *Nexteel* at *5-*6.  As

discussed above, Defendant-Intervenors' argument that a stay will

promote judicial economy is speculative and not well-founded.  A

granting of a stay in the instant case will serve no purpose other than to

delay the resolution of Plaintiffs' claims "in contravention of the Court's

objective to ensure the 'just, speedy, and inexpensive determination of

every action and proceeding.'" *Nexteel* at *7, citing to USCIT R. 1.

Plaintiffs therefore oppose Defendant-Intervenors' motion to stay

proceedings and request that the Court continue with its normal

procedures for scheduling and briefing.  Plaintiffs' proposed order is

attached hereto.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman*
Vivien J. Wang**
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel:   (202) 783-6900
Date:  April 4, 2022                              email: gmenegaz@dhlaw.com
*Counsel for Plaintiffs*

---

* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

** Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| HLDS (B) STEEL SDN BHD AND HLD CLARK STEEL PIPE CO., INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Ct. No. 21-00638 |
| UNITED STATES | ) ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) | |
| WELDED TUBE USA, INC., WHEATLAND TUBE COMPANY, AND VALLOUREC STAR L.P., | ) ) ) ) ) | |
| Defendant-Intervenors | ) ) | |

_____

## PROPOSED ORDER

Upon consideration of Defendant-Intervenors' Motion to Stay Proceedings and Plaintiffs' Opposition to Defendant-Intervenors' Motion to Stay Proceedings, and all other papers and proceedings in this action, it is hereby:

**ORDERED** that Defendant-Intervenors' Motion to Stay Proceedings is denied.

_____          _____
Date                                                M. Miller Baker, Judge