## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____
|
HLDS (B) STEEL SDN BHD AND )
HLD CLARK STEEL PIPE CO., INC., )
)
    Plaintiffs, )
   v. )   Ct. No. 21-00638
)
UNITED STATES )
)
    Defendant, )
   and )
)
WELDED TUBE USA, INC., )
WHEATLAND TUBE COMPANY, )
AND VALLOUREC STAR L.P., )
)
    Defendant-Intervenors )
_____)


PLAINTIFFS' HLDS (B) STEEL SDN BHD AND HLD CLARK STEEL PIPE CO.,
INC. RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION
<u>FOR JUDGMENT UPON THE AGENCY RECORD</u>


Gregory S. Menegaz
Alexandra H. Salzman
Vivien J. Wang
**DeKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave, N.W.
Washington, D.C. 20005
*Counsel to HLDS (B) Steel Sdn*
*Bhd and HLD Clark Steel Pipe Co.,*
*Inc.*

Dated: June 6, 2022

## TABLE OF CONTENTS

I.    INTRODUCTION AND STATEMENT OF CASE ........................1

II.   RULE 56.2 STATEMENT .........................................................2

    A.    Administrative Determinations Subject to Appeal .............2

    B.    Issues Presented .........................................................3

III.  STATEMENT OF FACTS .............................................................4

IV.   STANDARDS OF REVIEW .......................................................10

    A.    Substantial Evidence Standard ...........................................10

    B.    Arbitrary and Capricious Standard ....................................13

V.    ARGUMENT ...............................................................................15

    A.    Commerce's Comparison of HLD's production of OCTG
        to the Production Processes of Integrated Steel Mills
        was Unreasonable and Therefore Arbitrary and
        Capricious. ..........................................................................15

        1.    A Producer's Motive for Establishing
            Manufacturing Facilities at a Particular Location
            is Irrelevant to Commerce's Circumvention
            Inquiry Under 19 19 U.S.C. § 1677j(b).. ....................17

        2.    The Extent of an Integrated Steel Mill's
            Investments, Facilities, and Operations Does Not
            Answer the Question of Why the Integrated Mill is
            Comparable to OCTG Production. ..............................18

        3.    Commerce's Past Practice Does Not Support a
            Comparison of the HLD Companies' OCTG
            Production with Integrated Steel Mills. ....................25

        4.    Commerce's Discretion is Not Unlimited. ................35

i

B.   The HLD Companies' Manufacturing Processes in Brunei and the Philippines are Not Mere Assembly or Completion Operations.....................................................39

C.   Commerce Has Not Properly Considered Whether it is Appropriate in this Case to Find Circumvention, 19 U.S.C. § 1677j(b)(1)(E).. ..................................................54

VI.   CONCLUSION AND PRAYER FOR RELIEF ..........................60

# TABLE OF AUTHORITIES

## CASES

*Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) ........................................................33-34, 36-38, 59

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014)............... 15

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (2006).............. 14

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)10 ..................................................................... 10, 25, 37

*Bell Supply Co., LLC v. United States*, 179 F. Supp. 3d 1082 (Ct. Int'l Trade 2016) ..................................................................... 32

*Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ...........................................................24, 31, 32-33, 35

*Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ..................................................................... 31, 49, 51

*Bowen v. American Hospital Ass'n*, 476 U.S. 610 (1986) ................. 12, 37

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974)................................................................................... 13

*Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012)......................................................... 13

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984)....................................................................... 13

*Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197 (1938)............................................................................... 10, 12

*Cooper Tire & Rubber Co. v. United States*, 217 F. Supp. 3d

1373 (Ct. Int'l Trade 2017) ...................................................... 14

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ....................................................................................... 15

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983) ................................................... 10-11, 25

*Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) ............................................................... 37

*Husteel Co. v. United States*, 558 F. Supp. 2d 1357 (Ct. Int'l Trade 2008). ............................................................................ 22-23

*Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226 (Ct. Int'l Trade 2011) .................................................................... 11

*Macao Commer. & Indus. Spring Mattress Mfr. v. United States*, 437 F. Supp. 3d 1324 (Ct. Int'l Trade 2020) .............................. 46

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ...................................................................... 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................... 14, 37, 52

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002) .. 11-12, 37

*Peer Bearing Co.-Changshan v. United States*, 986 F. Supp. 2d 1389 (Ct. Int'l Trade 2014) ................................... 33, 49, 52-54

*RHP Bearings Ltd. v. United States*, 288 F.3d 1334 (Fed. Cir. 2002) ....................................................................................... 13

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ............................................................................. 34-35

*Serampore Industries Pvt. Ltd. v. United States*, 11 CIT 866 (1987) ...................................................................................... 12

*Serv. Women's Action Network v. Sec'y of Veterans Affairs*, 815

F.3d 1369 (Fed. Cir. 2016)...................................................................13-14

*Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d
1265 (Ct. Int'l Trade 2017) ...............................................................12, 15

*Smith-Corona Grp., Consumer Prods. Div., SCM Corp. v. United
States*, 713 F.2d 1568 (Fed. Cir. 1983). ..................................................21

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed Cir.
2005)....................................................................................................10

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44
F.3d 978 (Fed. Cir. 1994) ......................................................................11

*Timken Co. v. United States*, 968 F. Supp. 2d 1279 (Ct. Int'l
Trade 2014) .....................................................................................37-38

*Timken Co. v. United States*, 589 F. App'x 995 (Fed. Cir. 2015) ...........38

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996).........13

*Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474
(1951)........................................................................................10, 11, 25

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987) ...11

*Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255 (Ct. Int'l
Trade 2021) .........................................................................................37

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d
1370 (Fed. Cir. 2013) ...........................................................................12

*Zwicker Knitting Mills v. United States*, 82 Cust. Ct. 34 (U.S.
1979)....................................................................................................47

## STATUTES

5 U.S.C. § 706(2)(A) ...............................................................................13

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................ 10, 13

19 U.S.C. § 1677f(i)(3)(A) ................................................................ 14-15

19 U.S.C. §1677j(b) ........................................................................ *passim*

19 U.S.C. § 1677(24) ............................................................................ 55

## RULES & REGULATIONS

USCIT R. 56.2(c)(1) ................................................................................ 2

19 CFR § 351.225(b) ............................................................................ 57

19 CFR § 351.225(h) ........................................................................... 1, 2

## ADMINISTRATIVE DECISIONS

*Certain Corrosion-Resistant Steel Products from the People's
Republic of China: Affirmative Final Determination of
Circumvention of the Antidumping Duty and Countervailing Duty
Orders*, 83 Fed. Reg. 23,895 (Dep't Commerce, May 23, 2018) ........ 26, 28

*Certain Corrosion-Resistant Steel Products from Taiwan:
Affirmative Final Determination of Circumvention Inquiry on the
Antidumping Duty Order*, 84 Fed. Reg. 70,937 (Dep't Commerce,
Dec. 26, 2019) ........................................................................................ 26

*Certain Corrosion-Resistant Steel Products from the People's
Republic of China: Affirmative Final Determination of
Circumvention Involving the United Arab Emirates*, 85 Fed. Reg.
41,957 (Dep't Commerce July 13, 2020) ........................................... 26, 34

*Certain Corrosion-Resistant Steel Products From the People's
Republic of China: Affirmative Final Determination of
Circumvention Involving Malaysia*, 86 Fed. Reg. 30,263 (Dep't
Commerce, June 7, 2021). .................................................................. 26, 28

*Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative and Countervailing Duty Order,* 75 Fed. Reg. 3203 (Dep't Commerce, Jan. 20, 2010) ................................. 1

*Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order,* 75 Fed. Reg. 28,551 (Dep't Commerce, May 21, 2010) .......................................................... 1

*Certain Oil Country Tubular Goods from China*, Inv. No. 701-TA-463, USCIT Publ. 4124 (January 2010) .................................18-19, 29-30

*Certain Welded Carbon Steel Standard Pipes and Tubes From India*: Initiation of Circumvention Inquiry on the Antidumping Duty Order, 87 Fed. Reg. 9571 (Dep't Commerce, Feb. 22, 2022) (Oman and UAE) .................................................................... 26

*Common Alloy Aluminum Sheet from the People's Republic of China, Countervailing Duty Investigation:* Final Affirmative Determination, 83 Fed. Reg. 57,427 (Dep't Commerce, Nov. 15, 2018) ..................................................................................... 57

*Hot-Rolled Steel Products from China, India, Indonesia, Taiwan, Thailand, and Ukraine*, Inv. Nos. 701-TA-405, 406, and 408 & 731-TA-899-901 and 906-908 (Second Review), USITC Publ. 4445 (Jan. 2014) ................................................................................20-21

*Oil Country Tubular Goods from China*, Invs. 701-TA-463 and 731-TA-1159 (Second Review), USCIT Publ. 5136 (November 2020) ...........55

*Oil Country Tubular Goods From the People's Republic of China*: Self-Initiation of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders, 85 Fed. Reg. 71,877 (Dep't Commerce, Nov. 12, 2020) .......................................................... 4

*Oil Country Tubular Goods From the People's Republic of China:*
*Preliminary Affirmative Determinations of Circumvention*, 86 Fed.
Reg. 43,627 (Dep't Commerce, August 10, 2021) ..................................... 7

*Oil Country Tubular Goods From the People's Republic of China:*
*Final Affirmative Determinations of Circumvention,* 86 Fed. Reg.
67,443 (Dep't Commerce, Nov. 26, 2021)........................................ *passim*

*Oil Country Tubular Goods From the People's Republic of China:*
*Final Results of Antidumping and Countervailing Duty Changed*
*Circumstances Reviews*, 87 Fed. Reg. 15,915 (Dep't Commerce,
March 21, 2022). ....................................................................................... 3

*Polyethylene Retail Carrier Bags from Indonesia, Taiwan, and*
*Vietnam*, Inv. Nos. 701-TA-462 and 731-TA-1156-1158
(Preliminary), USITC Publ. 4080 (May 2009)........................................ 30

*Polyethylene Retail Carrier Bags from Taiwan: Affirmative*
*Preliminary Determination of Circumvention of the Antidumping*
*Duty Order*, 79 Fed. Reg. 31302 (June 2, 2014) ..................................... 28

*Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final*
*Determination of Circumvention of the Antidumping Duty Order*,
79 Fed. Reg. 61,056 (October 9, 2014) ................................................... 28

*Small Diameter Graphite Electrodes from the People's Republic of*
*China: Affirmative Preliminary Determination of Circumvention of*
*the Antidumping Duty Order and Extension of Final*
*Determination,* 77 Fed. Reg. 33405 (June 6, 2012)............................28-29

*Small Diameter Graphite Electrodes from the People's Republic of*
*China: Affirmative Final Determination of Circumvention of the*
*Antidumping Duty Order*, 77 Fed. Reg. 47,596 (August 9, 2012) .... 28, 29

## OTHER

Petretta, Ida, *The Question of Comparison*, The American Journal of Comparative Law, 2021 ....................................................................... 16

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), U.S.C.C.A.N. 4040 ............................................................................... 36, 45, 46 47

# GLOSSARY OF TERMS

| | |
|---|---|
| AD | Antidumping Duty |
| APA | Administrative Procedures Act |
| CORES | Corrosion-Resistant Steel |
| CVD | Countervailing Duty |
| ERW | Electric Resistance Welding |
| HRS | Hot-Rolled Steel |
| IDM | (Final) Issues and Decision Memo |
| ITA | Dep't Commerce, International Trade Administration |
| ITC | U.S. International Trade Commission |
| OCTG | Oil Country Tubular Goods |
| OECD | Organization for Economic Cooperation and Development |
| PDM | Preliminary Decision Memo |
| PRCB | Polyethylene Retail Carrier Bags |
| SAA | Statement of Administrative Action |
| SDGE | Small Diameter Graphite Electrodes |
| TRB | Tapered Roller Bearings |

## I.   INTRODUCTION AND STATEMENT OF CASE

Plaintiffs HLDS (B) Steel Sdn Bhd ("HLDSB"), and HLD Clark Steel Pipe Co., Inc. ("HLD Clark") (together: "HLD Companies") challenge the final determination of the U.S. Department of Commerce ("Commerce") in an anti-circumvention inquiry concerning oil country tubular goods ("OCTG") from China.  HLDSB is a Bruneian producer of OCTG, and HLD Clark is a Philippine producer of OCTG.

Commerce's circumvention inquiry concerned whether the HLD Companies' OCTG manufactured in Brunei and the Philippines using hot-rolled steel manufactured in China circumvented the antidumping and countervailing duty orders on OCTG from China.  *See Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order,* 75 Fed. Reg. 28,551 (Dep't Commerce, May 21, 2010) and *Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative and Countervailing Duty Order,* 75 Fed. Reg. 3203 (Dep't Commerce, Jan. 20, 2010) (the "Orders").  Commerce conducted the underlying circumvention inquiry pursuant to 19 U.S.C. § 1677j(b) and 19 CFR § 351.225(h), "merchandise completed or assembled in other foreign countries."  *See Oil Country Tubular Goods*

*From the People's Republic of China: Final Affirmative Determinations of Circumvention,* 86 Fed. Reg. 67,443 (Dep't Commerce, Nov. 26, 2021), **Appx01000**, and accompanying Issues and Decision Memorandum at 1, **Appx01002**.  The merchandise at issue is welded OCTG.

The HLD Companies challenge Commerce's finding that their OCTG manufactured in Brunei and the Philippines is circumventing the Orders on OCTG from China.  The HLD Companies therefore ask this Court to remand Commerce's final determination with instructions to find, based on record evidence, that the HLD Companies' production of OCTG in Brunei and the Philippines does not meet the criteria of 19 U.S.C. § 1677j(b) and 19 CFR § 351.225(h) for merchandise that is only "completed or assembled" in a third country.

## II.   RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), the HLD Companies hereby state the administrative decision subject to appeal and the issues of law presented:

### A.   Administrative Determination Subject to Appeal

Commerce published the contested final determination in the Federal Register on November 26, 2021 ("Final Circ. Det."), **Appx01000,**

and accompanying Issues and Decision Memorandum (Nov. 22, 2021)

("Final IDM"), **Appx01002**.

### B.    Issues Presented[1]

<u>Issue One</u>:  Commerce's comparison of an integrated steel mill's

manufacture of primary forms of steel with the HLD Companies'

manufacture of OCTG was unreasonable because the manufacturing

processes of the two industries are too different to compare in a

meaningful way.

<u>Issue Two</u>:  Commerce's determination that the HLD Companies'

manufacture of OCTG was merely an assembly or completion operation

was unreasonable and unsubstantiated by record evidence because the

hot-rolled steel input had no identifiable parts, form or use specifically

as a tubular product that can be used in the oil industry.  Record

information on OCTG production in China and legal sources such as the

U.S. International Trade Commission's investigative reports on OCTG

---

[1] The HLD Companies are no longer pursuing their claim in Count 3 of their
Complaint regarding certification of non-use of Chinese hot-rolled steel.  *See* HLD
Companies' Complaint, ECF Doc. No. 8 at 8 (Jan. 24, 2022).  In the meantime, as a
result of a changed circumstances review, Commerce has found the HLD
Companies eligible to participate in a certification process.  *See Oil Country
Tubular Goods From the People's Republic of China: Final Results of Antidumping
and Countervailing Duty Changed Circumstances Reviews*, 87 Fed. Reg. 15,915
(Dep't Commerce, March 21, 2022).

production provided Commerce with ample documentation of the extensive production processes necessary to manufacture OCTG.

Issue Three: Commerce did not properly evaluate the appropriateness of finding circumvention in this case because.

## III.  STATEMENT OF FACTS

This instant action concerns an anti-circumvention inquiry that Commerce self-initiated.  *See Oil Country Tubular Goods From the People's Republic of China: Self-Initiation of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 85 Fed. Reg. 71,877 (Dep't Commerce, Nov. 12, 2020) ("Initiation Notice"), **Appx03952**, and Dep't Commerce, Memorandum re: *Oil Country Tubular Goods from the People's Republic of China: Initiation of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders* (Nov. 3, 2020) ("Initiation Memo"), **Appx03837**.  Commerce alleged in its Initiation Memo that its analysis of the statutory criteria included in 19 U.S.C. § 1677j(b) warranted initiation of its anti-circumvention inquiry.  Initiation Memo at 11, **Appx03847**.  The statute reads as follows:

> (b) Merchandise completed or assembled in other foreign countries.

(1) In general. If—

    (A) merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is the subject of—

        (i) an antidumping duty order issued under section 736 {19 USCS § 1673e},

        (ii) a finding issued under the Antidumping Act, 1921, or

        (iii) a countervailing duty order issued under section 706 {19 USCS § 1671e} or section 303,

    (B) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which—

        (i) is subject to such order or finding, or

        (ii) is produced in the foreign country with respect to which such order or finding applies,

    (C) the process of assembly or completion in the foreign country referred to in subparagraph (B) is minor or insignificant,

    (D) the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States, and

    (E) the administering authority determines that action is appropriate under this paragraph to prevent evasion of such order or finding,

the administering authority, after taking into account any advice provided by the Commission under subsection (e), may include such imported merchandise within the scope of such order or finding at any time such order or finding is in effect.

(2) Determination of whether process is minor or insignificant. In determining whether the process of assembly or completion is minor or insignificant under paragraph (1)(C), the administering authority shall take into account—

(A) the level of investment in the foreign country,

(B) the level of research and development in the foreign country,

(C) the nature of the production process in the foreign country,

(D) the extent of production facilities in the foreign country, and

(E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

(3) Factors to consider. In determining whether to include merchandise assembled or completed in a foreign country in a countervailing duty order or an antidumping duty order or finding under paragraph (1), the administering authority shall take into account such factors as—

(A) the pattern of trade, including sourcing patterns,

(B) whether the manufacturer or exporter of the merchandise described in paragraph (1)(B) is affiliated with the person who uses the merchandise described in paragraph (1)(B) to assemble or complete in the foreign country the merchandise that is subsequently imported into the United States, and

(C) whether imports into the foreign country of the merchandise described in paragraph (1)(B) have increased after the initiation of the investigation which resulted in the issuance of such order or finding.

19 U.S.C.S. § 1677j(b).

In its initiation memorandum, Commerce found that available information indicated that the HLD Companies' production of OCTG fulfilled the above circumvention criteria.  Initiation Memo at 4-11, **Appx03840-03847**.

During the preliminary phase of Commerce's inquiry, each of the HLD Companies responded to Commerce's initial and supplemental questionnaires and provided surrogate values for Commerce's calculation of the value of HLD's hot-rolled steel inputs from China.

In its preliminary determination, Commerce found that OCTG from Brunei and the Philippines using Chinese hot-rolled steel was circumventing the Orders on OCTG from China. *See Oil Country Tubular Goods from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention*, 86 Fed. Reg. 43,627 (Dep't Commerce Aug. 10 2021) and accompanying Decision Memorandum ("Prelim IDM"), **Appx01022-01041**.  Under its "statutory analysis," Commerce concentrated on the question as to whether the assembly or completion of OCTG in Brunei and the Philippines is minor or insignificant as provided in 19 U.S.C. §§ 1677j(b)(1)(C) & (b)(2)(A)-(E).  Prelim IDM at 8 – 13, **Appx01032-01037**.  To arrive at its conclusions and relying on a 2015 report by the Organization for Economic Cooperation and Development ("OECD")[2], Commerce compared investment levels, production facilities, and the nature of

operations of *integrated* steel mills to the HLD Companies' investment

levels, production facilities, and processing operations in the

manufacture of OCTG that were not integrated steel mills. *Id.* at 9-10

& 13, **Appx01033-01034, Appx01037**.  In its comparison, Commerce did

not calculate what proportion of investment, steel facilities, and

operations of its selected integrated steel mills were dedicated solely to

the production of finished OCTG.

In their case brief, the HLD Companies argued that comparing an

integrated steel mill with OCTG manufacturing was unreasonable

because integrated steel mills produce primary steel in many different

forms and chemical composition to serve many downstream

manufacturing industries, not just OCTG manufacturing.  Only a very

small portion of an integrated mill's investment, facilities, and

operations would be used to supply a single OCTG manufacturer such

as HLD Clark or HLDSB.  HLD Companies Case Brief (Sept. 16, 2021)

at 6-11 ("HLD Case Br,"), **Appx03795-03800**.

Further, in the injury investigation conducted by the International

---

[2] OECD, Future Investment Projects in the Global Steel Industry and Implications for the Balance of Steelmaking Processes (March 10, 2015, included in Commerce's Initiation Memo at Ex. 8, **Appx03884-03919**.

Trade Commission ("ITC"), the ITC and the U.S. OCTG industry members described the OCTG manufacturing process as beginning with the "forming phase" using hot-rolled steel as a major input.  The HLD Companies also pointed out that none of the members of the U.S. OCTG industry participating in the anti-circumvention inquiry, and Defendant-Intervenors in this action, are integrated steel mills.  HLD Case Br. at 2-6 & 11-15, **Appx03791-03795**, **Appx03800-03804**.

The HLD Companies also argued that a finding of circumvention in this case is not appropriate because OCTG from Brunei and the Philippines has only a minimal presence on the U.S. market.  See 19 U.S.C. § 1677j(b)(1)(E).  HLD Case Br. at 15-18, **Appx03804-03807**.

In its final determination of circumvention, Commerce continued to justify its comparison of the HLD Companies' investments, production facilities, and production process with those of an integrated steel mill.  Commerce also refused to consider the record information that provided a comparison of investment levels, production facilities, and the nature of operations of other OCTG manufacturers to the HLD Companies' investments, facilities, and production processes.

As discussed below, Commerce's grounds for dismissing

respondents' evidence are not well taken.  Commerce has turned a blind

eye and failed to take into consideration every document and statement

that fairly detracts from its analysis, which is conclusory at best.

## IV.   STANDARDS OF REVIEW

### A.   Substantial Evidence Standard

This Court "shall hold unlawful any determination . . . found . . . to

be unsupported by substantial evidence on the record or otherwise not

in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); *accord SNR*

*Roulements v. United States*, 402 F.3d 1358, 1361 (Fed Cir. 2005).

"[S]ubstantial evidence is more than a mere scintilla.  It means

such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S.

474, 477 (1951) (*quoting Consolidated Edison Corp. v. NLRB*, 305 U.S.

197, 229 (1938)).  Furthermore, "substantial evidence" must be

measured by a review of the record as a whole, "including whatever

fairly detracts from the substantiality of the evidence. *Atlantic Sugar,*

*Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is

appropriate to set aside the ITA's decision when the court 'cannot

conscientiously find that the evidence supporting that decision is

substantial, when viewed in the light that the record in its entirety

furnishes, including the body of evidence opposed to [its] view.'"
*Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888
(1983) (*quoting Universal Camera*, 340 U.S. at 488).

Moreover, Commerce's determination cannot be based on "isolated
tidbits of data which suggest a result contrary to the clear weight of the
evidence. *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487,
489 (1987). The substantial evidence standard "requires more than
mere assertion of 'evidence which in and of itself justified {the
determination}, without taking into account contradictory evidence or
evidence from which conflicting inferences could be drawn.'"
*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d
978, 985 (Fed. Cir. 1994) (*quoting Universal Camera Corp. v. Nat'l
Labor Relations Bd.*, 340 U.S. 474, 487-488 (1951); *see Mittal Steel
Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380-1381 (Fed. Cir.
2008) (same); s*ee also, e.g., Jinan Yipin Corp. v. United States*, 800 F.
Supp. 2d 1226, 1233-1234(U.S. Ct. Int'l Trade Sep. 26, 2011).

In addition, Commerce's determinations must be based on actual
evidence.  As this Court has summarized: "[t]heory will not suffice. The
Court of Appeals has underscored this principle, explaining that '[i]t is

well established that speculation does not constitute 'substantial evidence." *Novosteel SA v. United States*, 284 F.3d 1261, 1276 (Fed. Cir. 2002). The Court of Appeals continued: 'As the Supreme Court noted in *Bowen v. American Hospital Ass'n*, agency deference has not come so far that agency action is upheld whenever it is possible to conceive a basis for administrative action.' *Id.; see also, e.g., Yangzhou Bestpak Gifts & Crafts*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (noting that Commerce determinations cannot be based on "mere conjecture or supposition"). *Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265, 1305 (Ct. Int'l Trade 2017). Furthermore, proffered evidence must be reliable. "Mere uncorroborated hearsay or rumor does not constitute substantial evidence." *Consolidated Edison Corp. v. NLRB*, 305 U.S. 197, 230 (1938).

In deciding issues of law, Commerce's interpretation of ambiguities in the antidumping statute normally is entitled to substantial deference, but "the traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Serampore Industries Pvt. Ltd. v. United States*, 11 CIT 866, 869 (1987) (citation omitted).  Accordingly, when the

statute is plain on its face, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-443, *reh'g denied* 468 U.S. 1227 (1984).

### B.   Arbitrary and Capricious Standard

Federal courts have recognized that the standard of review under 19 U.S.C. § 1516a(b)(1)(B)(i) encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). "[A]n agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently. "*RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (*quoting Transactive Corp. v. United States*, 91 F.3d 232, 237, 319 U.S. App. D.C. 428 (D.C. Cir. 1996)). For an agency action to be upheld, it must "offer some rationale that could explain the maintenance of different standards for similarly situated claimants, or it must explain why such claimants are in fact not similarly situated. "*Serv. Women's Action Network v. Sec'y of Veterans Affairs*, 815 F.3d 1369, 1380 (Fed. Cir.

2016).  *See Cooper Tire & Rubber Co. v. United States*, 217 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2017).

Moreover, an agency "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S., 29, 48 (citations omitted).  Internal inconsistency and self-contradiction do not satisfy this requirement. Indeed, a "principal justification for the administrative state is that in 'area[s] of limitless factual variations, like cases will be treated alike.'" *Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333, 1339 (Ct. Int'l Trade 2006) (internal citation omitted) ("Courts will therefore not defer to an agency regulation or adjudicative decision when they produce results which are arbitrary, capricious, or manifestly contrary to the statutory scheme.").  Thus, when the administering agency treats similarly situated parties differently or fails to consider an important aspect of a problem, its decisions are arbitrary and capricious and subject to reversal.

Further, Commerce's rationale must address the parties' principal arguments.  19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of the basis for its

14

determination that addresses relevant arguments, made by interested parties"). *See also CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1375-81 (Fed. Cir. 2016) (analyzing in detail an agency's obligation to set forth a comprehensible and satisfactory justification for its determinations "as a reasonable implementation of statutory directives supported by substantial evidence"). Finally, in *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-52 (D.C. Cir. 2014) the Court underscored the importance of an agency's obligation to "articulate an explanation for its action," stating that "a fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action"); *see Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265, 1277 (Ct. Int'l Trade 2017).

## V.  ARGUMENT

### A. Commerce's Comparison of HLD's production of OCTG to the Production Processes of Integrated Steel Mills was Unreasonable and Therefore Arbitrary and Capricious.

Commerce's task in the underlying circumvention inquiry was to determine whether the HLD Companies' production of OCTG in Brunei and the Philippines fulfilled the criteria of 19 U.S.C. § 1677j(b).  To accomplish its task, Commerce utilized a comparison methodology,

comparing the HLD Companies' production of OCTG to an integrated steel mill's production of primary steel forms.

"Comparison is a key component of legal reasoning.  We move merrily from like to like within the doctrine of precedent.  We invoke comparison whenever we distinguish or apply a case."  Petretta, Ida, *The Question of Comparison*, The American Journal of Comparative Law, 2021; available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3832040 (last accessed June 2, 2022).  "To compare things, they must have characteristics that are similar enough in relevant ways to merit comparison. If two things are too different to compare in a useful way, an attempt to compare them is colloquially referred to in English as 'comparing apples and oranges.'" https://en.wikipedia.org/wiki/Comparison (last accessed June 2, 2022). "The idiom, comparing apples and oranges, refers to the apparent differences between items which are popularly thought to be incomparable or incommensurable, such as apples and oranges. The idiom may also be used to indicate that a false analogy has been made between two items, such as where an apple is faulted for not being a

good orange." https://en.wikipedia.org/wiki/Apples_and_oranges (last accessed June 2, 2022).

1.    **A Producer's Motive for Establishing Manufacturing Facilities at a Particular Location is Irrelevant to Commerce's Circumvention Inquiry Under 19 19 U.S.C. § 1677j(b).**

In its final inquiry determination, Commerce presented several reasons as to why it believed that a comparison of the HLD Companies' production of OCTG was comparable to an integrated steel mill's production of primary steel forms. One line of Commerce's reasoning is that the comparison is relevant to whether a producer would reasonably move its further processing across borders to avoid an AD or CVD order. Final IDM at 6, **Appx01007**. Commerce's reason, however, does not address any statutory criterion of circumvention. The statute makes no mention of inquiring into the respondent producer's motive for establishing its manufacturing facilities in a particular location. In fact, in prior cases, Commerce has agreed: "that a company's operations were not set up for the purpose of circumventing an order bears no relation to whether, at a later time, that company's operations may be found to be in circumvention of a since-established order, which is precisely what the provisions of section 781(b) of the Act set out to

establish."   Dep't Commerce, Issues and Decision Memorandum for Anti-Circumvention Inquiry involving Taiwan {sic}[3] on the Antidumping Duty Order on *Certain Corrosion-Resistant Steel Products from Taiwan* (June 1, 2021) at 20.("CORES Taiwan Final IDM - Malaysia").   Indeed, the Chinese pipe producing entity was never an integrated steel mill and is not so now.   No relevant particular steel mill making primary forms in China has been alleged in the self-initiated proceeding as having the intent and in fact moving across borders to evade orders on primary forms.

2.   **The Extent of an Integrated Steel Mill's Investments, Facilities, and Operations Does Not Answer the Question of Why the Integrated Mill is Comparable to OCTG Production.**

A further line of reasoning that Commerce employs is that the comparison is reasonable because the production of primary forms of steel is capital-intensive, investments and production facilities are larger, and the production processes are more complex.   Final IDM at 6, **Appx01007.**   First, Commerce's conclusory remark that the production of primary steel forms is more complex than the production of OCTG is debatable.   *See* OCTG production process with illustration in USITC

---

[3] Should be "Involving Malaysia."

Publ. 4124, *Certain Oil Country Tubular Goods from China* (January

2010) at I-14 – I-20, included in Initiation Memo as Ex. 2, **Appx03854-**

**03860**.

In particular, however, Commerce's observations that steel

production is "capital-intensive" does not answer the question of why or

how the comparison between the production of primary steel forms,

including hot-rolled steel, and the production of welded OCTG is

appropriate.  *Id*.  Indeed, the variety of primary steel forms that an

integrated steel mill produces and the wide range of downstream

customers and uses of steel in all imaginable forms require large

investments and production facilities.  The vast majority of the

investments and production facilities of the integrated steel mills that

Commerce uses as a comparison group have nothing to do with the

production of OCTG.  Thus, Commerce's reasoning that integrated steel

mills provide "an absolute level of investment" and "context" for the

production of OCTG is too wide of the mark to be a reasonable

argument that integrated mills are relevant as a base comparison

group.  To make a viable argument that the production of hot-rolled

steel in integrated mills is comparable in the context of the HLD

Companies' production of OCTG, Commerce would have had to calculate the proportion of investment, steel facilities, and operations of the integrated mills that are dedicated solely to the production of finished OCTG.  Commerce engaged in no such inquiry.

Even canvasing the integrated steel producers that specialize in hot-rolled steel would not resolve the comparability question. Hot-rolled steel has a great array of uses and applications, and integrated mills typically serve numerous industry sectors.  The ITC reports that hot-rolled steel is used in the automotive, auto parts, appliances, transportation infrastructure, and construction industries, either directly or as downstream derivatives.  Along with the energy tubular products, which includes OCTG, the ITC reports the following end uses: "agricultural equipment, beam assemblies, brake components, boilers, bumpers, conduit, cranes, dishwashers, electrical housings, guard rails, hollow structural shapes, hydraulic tanks, industrial machinery, lawn mower decks, pilings, platforms, refrigerators, shelving racks, shipbuilding machinery, steel grating, tin mill products, torque converter covers, and washing machines." *See Hot-Rolled Steel Products from China, India, Indonesia, Taiwan, Thailand, and Ukraine*,

Inv. Nos. 701-TA-405, 406, and 408 & 731-TA-899-901 and 906-908 (Second Review), USITC Publ. 4445 (Jan. 2014) at II-10.  Commerce did not attempt to determine the percentage of hot-rolled coil produced at the illusive integrated mill that is sold to a specific OCTG manufacturer.  Surely to make an "apples-to-apples" comparison, Commerce must break down the amount of the investment, the proportion of production, and the extent of the production facilities of a specific producer of hot-rolled steel coil required to supply the steel input to a typical OCTG manufacturer.  "One of the goals of the statute is to guarantee that the administering authority makes the fair value comparison on a fair basis -- comparing apples with apples."  *Smith-Corona Grp., Consumer Prods. Div., SCM Corp. v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983).  Or, in the alternative, Commerce would have had to cumulate the value of production of all downstream products, including pipe, to make that comparison.

In its final determination, Commerce responded to this same argument that the HLD Companies included in their case brief before the agency. *See* HLD Companies Case Brief (Sept. 16, 2021) at 6-9, **Appx03795-03798**.  Commerce found that it could not ascertain the

proportion of investments, facilities, and operations that its canvased integrated steel mills used to make hot-rolled steel dedicated to the OCTG industry because "no party provided evidence or information which might enable us to conduct such an analysis." Final IDM at 8, **Appx01009.** Yet the OECD report on integrated steel mills is evidence that Commerce itself put on the record for comparison purposes, and the problem of incomparability because large parts of the integrated mills' investments, facilities, and operations are unrelated to the production of OCTG renders Commerce's evidence unusable. It is therefore in Commerce's hand to fix the data and show its significance. In *Husteel*, for instance, Commerce presented empirical evidence that the price of OCTG sold to China is less than the price of OCTG sold to the rest of the world. The Court found a problem with the data, however, because Commerce included only average world price as a comparison, which hid the distribution of prices across countries. Therefore, the Court could not evaluate whether Chinese OCTG prices were significantly different than those in the rest of the world. The Court found that Commerce had not adequately dealt with the objections to the data raised by the respondents and required Commerce, not the parties, to present sufficient evidence for the Court

22

to evaluate Commerce's conclusions. *Husteel Co. v. United States*, 558
F. Supp. 2d 1357, 1364-65 (Ct. Int'l Trade 2008).

In other words, Commerce cannot put on the record its own
incorrect, incomplete, or unusable data and then use such information
as the basis of its determinations, claiming that nothing better is found
on the record.  In the case underlying this action, however, the
administrative record includes abundant alternative data to evaluate
the extent of the HLD Companies' investments, production facilities,
and production processes.

The record information of this case shows that the HLD
Companies' investment, OCTG production facilities, and OCTG
production processes are comparable to those of their Chinese
counterparts, which are referred to here as Company A and Company
B. *See, e.g.,* HLD Clark Questionnaire Response (March 16, 2021)
("HLD Clark Qre Rsp.") at 5, **Appx02213**, and Ex. 1.2 (company
brochure), **Appx02248-02282**; Ex 9.1 and 9.2 (Company A & Company B
lists of machinery), **Appx02412-02423**; Ex. 12 (Company A & Company
B production flowcharts), **Appx02424-02428**; Ex. 25.1 (Company A &
Company B business scope in business licenses), **Appx02479-02481** &

**Appx02490-02491**; & Ex. 25.2 (Company A & Company B hot-rolled steel purchase documents), **Appx02540-02553**; HLD Clark Supplemental Questionnaire Response (June 17, 2021) ("HLD Clark Supp. Rsp.") at 1, **Appx03342**, and Ex. SQ1-4.1 & SQ1-4.2 (Company A & Company B lists of machinery), **Appx03365-03388**; Ex. SQ1-6.1 (Company A & Company B production flowcharts), **Appx03414-03418**. *See also* HLD Clark Preliminary Comments at 4 – 5, **Appx03765-03766**.

This is not a case where no alternative to Commerce's comparison with an integrated mill is the only information on the record by which to evaluate the extent of HLD's investments, facilities, and operations. *See, e.g.*, *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1295-96 (Ct. Int'l Trade 2018) (where no record evidence was available for Commerce to compare the investment in downstream processing of OCTG with the investment required for the complete production of OCTG in Indonesia, and the Court therefore found that Commerce's comparison with investments made to establish a seamless pipe production facility reasonable). Here, Commerce has ample record evidence that the HLD Companies' manufacturing processes are major and comparable to the manufacturing processes of non-integrated

Chinese OCTG producers.

As noted above, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

### 3. Commerce's Past Practice Does Not Support a Comparison of the HLD Companies' OCTG Production with Integrated Steel Mills.

In the underlying case, Commerce found that the HLD Companies producing OCTG in Brunei and the Philippines, which are not covered by an AD/CVD order, are circumventing the Orders on OCTG from China because they used hot-rolled steel as an input in their OCTG production. Only recently has Commerce developed a practice of finding that third country producers of articles of steel not under an AD/CVD

order are circumventing an AD/CVD order on the steel article from a different subject country because they use hot-rolled steel from the subject country.  Commerce's practice began with a series of cases targeting corrosion-resistant steel ("CORES") from Malaysia, Vietnam, and United Arab Emirates (not under AD/CVD orders), which used hot-rolled steel from a country under an AD/CVD order, including China, Korea, and Taiwan, as an input.[4]  In the meantime, Commerce and the U.S. domestic producers have moved to target OCTG and other steel pipe manufacturers that use hot-rolled steel from countries under an AD/CVD order on the specific steel article.[5]

---

[4] *See, e.g.*, *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 Fed. Reg. 23,895 (Dep't Commerce, May 23, 2018);

*Certain Corrosion-Resistant Steel Products from Taiwan: Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 Fed. Reg. 70,937 (Dep't Commerce, Dec. 26, 2019);

Dep't Commerce, *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957 (Dep't Commerce, July 13, 2020);

*Certain Corrosion-Resistant Steel Products From the People's Republic of China: Affirmative Final Determination of Circumvention Involving Malaysia*, 86 Fed. Reg. 30,263 (Dep't Commerce, June 7, 2021).

[5] *See, e.g., Certain Welded Carbon Steel Standard Pipes and Tubes From India*: Initiation of Circumvention Inquiry on the Antidumping Duty Order, 87 Fed. Reg. 9571 (Dep't Commerce, Feb. 22, 2022) (Oman and UAE);

Using the circumvention statute to target manufacturers of articles of steel that use hot-rolled steel as an input is not Commerce's "standard practice." *See* Domestic Producers' (Defendant-Intervenors in this action) rebuttal argument in Final IDM, **Appx01006**. Commerce created this theory and practice of using the circumvention statute against companies sourcing hot-rolled steel from a subject country out of whole cloth. Until the CORES cases, Commerce's prior precedents targeted actual "assembly and completion" operations as mandated by the circumvention statute. As indicated above, the HLD Companies manufacture OCTG from start to finish as described by the ITC and petitioners, and the manufacturing process is far more than purchasing

---

Ltr. From Wiley Rein LLP and Shagrin Associates, *Certain Circular Welded Non-Alloy Steel Pipe from the Republic of Korea* – Request for Circumvention Inquiry (Vietnam) (May 17, 2022);

Ltr. From Wiley Rein LLP and Shagrin Associates, *Certain Circular Welded Carbon Steel Pipes and Tubes From Taiwan (A-583-008) and Circular Welded Non-Alloy Steel Pipe From Taiwan (A-583-814)*–Request for Circumvention Inquiries (Vietnam) (May 17, 2022);

Ltr. From Wiley Rein LLP and Shagrin Associates, *Light-Walled Rectangular Pipe and Tube from the Republic of Korea*: Request For Circumvention Inquiry (Vietnam) (May 17, 2022);

Ltr. From Wiley Rein LLP and Shagrin Associates, *Certain Welded Carbon Steel Standard Pipes and Tubes from India* – Request for Circumvention Inquiry (Vietnam) (May 17, 2022);

Ltr. From Wiley Rein LLP and Shagrin Associates, *Light-Walled Rectangular Pipe and Tube from the People's Republic of China* – Request for Circumvention Inquiry (Vietnam) (May 17, 2022).

components to be screwed together or completing a delivered tube by coating or even threading the ends.

Other than the CORES determinations from 2018 and 2021 that Commerce relies upon in its final determination memorandum,[6] Commerce also relies on earlier circumvention cases concerning small diameter graphite electrodes from China (2012)[7] and polyethylene retail carrier bags from Taiwan (2014).[8]  Final IDM at 6-13, **Appx01007-01014**.  In the graphite electrodes circumvention case, the article purchased and delivered to the respondent was a fully formed

---

[6] *See, e.g.*, fn 24, 32-36, 41, 42, 45, 47, 48, 52, 54, 60-61, and 68, *citing Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 Fed. Reg. 23,895 (May 23, 2018) (*CORES Final*), and accompanying IDM; fn 28, *Certain Corrosion-Resistant Steel Products from Taiwan: Affirmative Final Determination of Circumvention Involving Malaysia*, 86 Fed. Reg. 30,257 (June 7, 2021), and accompanying IDM.

[7] *See Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 Fed. Reg. 33405 (June 6, 2012) (*SDGE China Prelim*), unchanged in *Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 47,596 (August 9, 2012) (*SDGE China Final*).

[8] *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 Fed. Reg. 31302 (June 2, 2014) (*PRCBs Taiwan Prelim*), and accompanying PDM, unchanged in *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 Fed. Reg. 61,056 (October 9, 2014) (*PRCBs Taiwan Final*).

graphitized rod that respondent machined to complete a finished electrode.  SDGE Prelim, 77 Fed. Reg. 33405, 33410. In the SDGE case, Commerce found that the graphitized rod that the respondent purchased from China was, in fact, covered by the scope language of the AD order on SDGE from China as an "unfinished electrode."  *See* SDGE China Prelim at 33411 ("Based on a full review of the record, including a review of the submissions by the parties, the plain language of the scope of the *SDGE Order,* as well as the language from the Petition and the ITC investigation, as discussed above, the Department preliminarily determines that the unfinished artificial graphite inputs sourced from the PRC by UKCG constitute products identical to the "unfinished electrodes" considered subject merchandise under the scope of the SDGE Order.).  *Unchanged* in SDGE China Final, 77 Fed. Reg. 47596, 47598.  In contrast, neither Commerce nor Defendant-Intervenors have claimed that the HLD Companies' hot-rolled steel input was an unfinished oil country tubular product.  The HLD Companies had to form the purchased hot-rolled sheet into tubular form through a series of rolling operations before it could be considered a pipe for any use.  *See* OCTG production process with illustration in USITC Publ. 4124, *Certain Oil Country Tubular Goods from China* (January 2010) at I-16,

29

included in Initiation Memo as Exhibit 2, **Appx03856**.

Similarly, the article that the respondent purchased in the polyethylene bags circumvention case was a continuous roll of tubular polyethylene film that resembled in-scope PRCBs in all respects except that they were in a continuous roll such that the bottoms were open and they lacked handles.  PRCBs Taiwan Preliminary Decision Memorandum (May 27, 2014) at 1 (PRCBs Taiwan PDM).  The only processing still necessary to make the final bag was to cut the unfinished PRCBs to length, seal the bottoms, and die-cut the handles. *Id.* at 1-2.  The purchased input was not, *e.g.*, polyethylene resin pellets that needed to be put through an extruder to manufacture film nor even film that had to be put through an air bubble to create the finished tube.  *See* USITC Publ. 4080, *Polyethylene Retail Carrier Bags from Indonesia, Taiwan, and Vietnam*, Inv. Nos. 701-TA-462 and 731-TA-1156-1158 (Preliminary) (May 2009) at I-7 for an illustration of the PRCB production process.  On the other hand, the ITC's report of the manufacturing process of PRCBs does not include the production of the polyethylene resin pellets that were the major input for the bags. Commerce's comparison of the PRCB respondents' finishing operations

in the United States with the production process of the film tubes makes no mention that the process starts with the production of the polyethylene resin.  *See* PRCB PDM at 8-12.

As stated above, the HLD Companies' purchased hot-rolled steel cannot be characterized as "unfinished OCTG," but rather could have been used in a variety of industry sectors, including car parts, appliances, or in the construction of buildings.

A final consideration is Commerce's reference to its second remand redetermination pursuant to remand order in the *Bell Supply* litigation.  Final IDM at 6 and FN 25.  **Appx01007**.  *Bell Supply* was an action brought by a U.S. importer of OCTG.  The OCTG at issue was from an Indonesian supplier that heat-treated and finished green tubes sourced from Chinese producers.  The importer challenged Commerce's scope determination that the Chinese green tubes were included in the OCTG Orders.  *See* the CIT's final opinion after appeal to the CAFC and further remand, *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ("*Bell Supply VI*") and an earlier opinion in the litigation, *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1284-1285 (Ct. Int'l Trade 2018) ("*Bell Supply V*").

In its second remand redetermination that Commerce refers to, Commerce found that it was reasonable to compare the suppliers' investments for processing green tubes into finished OCTG with an integrated pipe mill. Dep't Commerce, Final Results of Second Remand Redetermination Pursuant to Remand dated August 11, 2016 in *Bell Supply Company, LLC v. United States*, Slip Op. 16-41 (CIT, April 27, 2016) at 27 {*Bell Supply Co., LLC v. United States*, 179 F. Supp. 3d 1082 (Ct. Int'l Trade 2016), "*Bell Supply II*"}. The *Bell Supply* Court's decision on this issue accepted Commerce's comparison, but with the proviso that "as Commerce noted, the ideal analytical approach would be to compare the level of investment for the processing of OCTG in Indonesia to the investment required for the processing company to completely produce OCTG in Indonesia." *Bell Supply V*, 348 F. Supp. 3d at 1295. Thus, according to the Court's scrutiny, and evidently Commerce's practice at the time, the proper analysis in the *Bell Supply* scope action would have been to compare the investments in the third country for the production of OCTG, which in the HLD Companies' case is the same as its total investments. In other words, in the time leading up to the Court's decision in *Bell Supply V*, Commerce would have had no circumvention case at all because the HLD Companies perform all

manufacturing processes for finished OCTG at their plants in Brunei and the Philippines.

Furthermore, several circumstances distinguish *Bell Supply* from the HLD Companies' case. *Bell Supply* was a scope case in which the purchased green tube was ultimately determined to be unfinished OCTG and covered by the Orders on OCTG from China. Further, Commerce used its comparison methodology in a substantial transformation analysis rather than a circumvention analysis. As the court found in *Peer Bearing*, because the circumvention statute seeks to place merchandise under AD and CVD orders where the country of origin is not the subject country and therefore not within the scope of the orders, specific criteria not present in a scope inquiry must be fulfilled. *Peer Bearing Co.-Changshan v. United States*, 986 F. Supp. 2d 1389, 1403-05 (Ct. Int'l Trade 2014).

In sum, Commerce's practice of comparing manufacturers' production of discrete steel articles with integrated steel mills in a series of recent circumvention inquiries is not justified by Commerce's practice prior to 2018. Insofar, the Court's decision in *Al Ghurair* is not well taken where the Court states that Commerce's comparative

analysis is reasonable because the approach aligns with the agency's

past practice.  *See Al Ghurair Iron & Steel LLC v. United States*, 536 F.

Supp. 3d 1357, 1368 (Ct. Int'l Trade 2021).  The *Al Ghurair* case

concerns Commerce's decision in the CORES circumvention case,

*Certain Corrosion-Resistant Steel Products from the People's Republic*

*of China: Affirmative Final Determination of Circumvention Involving*

*the United Arab Emirates*, 85 Fed. Reg. 41,957 (Dep't Commerce July

13, 2020) and accompanying Issues and Decision Mem. (IDM) ("CORES

China-UAE").  In its analysis of Commerce's past practice, the Court

discusses both Commerce's recent CORES decisions and the SDGE and

PRCB determinations discussed above.  *Al Ghurair*, 536 F. Supp. 3d at

1369.  In particular, the Court considers Commerce's practice of

comparing the manufacture of discrete steel articles using hot-rolled

steel as an input with integrated steel mills to be a "routine" practice

and if "'Commerce has a routine practice for addressing like situations,

it must either apply that practice or provide a reasonable explanation

as to why it departs therefrom.'" *Citing Save Domestic Oil, Inc. v.*

*United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004).[9]  *Id.*  Yet

---

[9] *Save Domestic Oil* concerned Commerce's dismissal of an AD/CVD
petition, whereby Commerce developed a matrix to compare each

Commerce has never justified the change in its comparison analysis.

Commerce's standard practice was to compare the specific

manufacturing processes for the subject merchandise, as described by

the investigation petitioners and reported by the ITC, to the assembly

or completion processes performed by the targeted respondent.  As the

*Bell Supply* Court noted, "{d}ifferent industries have different barriers

to entry—a small capital investment in one industry might be

significant in another."  *Bell Supply V*, 348 F. Supp. 3d at 1296.

Commerce's recent approach to compare the production of articles of

steel with the production of primary forms of steel in an integrated steel

mill is not reasonable because it compares two industries that are too

dissimilar in their barriers to entry, in the type of goods produced, and

in the downstream industries that their finished products aim to serve.

### 4.  Commerce's Discretion is Not Unlimited.

A fourth argument for the reasonableness of its comparison

methodology that Commerce presents is that the statute does not

---

company's dependency on imports (none, low, significant, high) to its
stake in domestic production (based on factors such as production
volume, number of workers, number of new wells drilled, number of
wells in operation, oil-field-related capital expenditures, and reserve
holdings, 357 F.3d at 1281).

instruct Commerce to use a particular methodology to apply to

circumvention cases, and therefore, Commerce has discretion to

determine an appropriate analysis to apply. Final IDM at 7,

**Appx01008** and 10-11, FN 11, **Appx01011-01012**, referring to the

Statement of Administrative Action, Accompanying the Uruguay Round

Agreements Act (URAA), H. Doc. 103-316, vol. 1 (1994), U.S.C.C.A.N.

4040, 4216 ("SAA") instructing Commerce to evaluate the circumvention

criteria found in 19 U.S.C. § 1677j(b)(2), depending on the particular

circumvention scenario. Commerce also notes the Court's statement in

*Al Ghurair* that "Commerce has the discretion to adapt to different

factual circumstances to address circumvention." Final IDM at 10-11,

FN 11, **Appx01011-01012,** citing to *Al Ghurair*, 536 F. Supp. 3d at 1368.

Indeed, the *Al Ghurair* Court put Commerce's discretion to decide its

own method of analysis in circumvention cases to be the first of four

grounds for the reasonableness of Commerce's comparison of the

CORES producer's investments, production facilities, and production

processes with those of an integrated steel mill. *Id.* The problem with

Commerce's and the *Al Ghurair* Court's treatment of Commerce's

discretion is that it begs the question as to whether Commerce's

exercise of its discretion was reasonable. Neither Commerce nor the *Al*

*Ghurair* Court asks the question as to whether Commerce abused its

discretion.  The *Vincentin* Court recently provided the proper point of

departure:  "{t}he court reviews Commerce's determinations for

substantial evidence, meaning that they are reasonable given the

factual record in the case. *See Huaiyin Foreign Trade Corp. v. United*

*States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citing *Atl. Sugar, Ltd. v.*

*United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The lack of a

statutory directive does not render Commerce's alternative methodology

reasonable. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43-49, 103 S. Ct. 2856, 77 L. Ed. 2d 443

(1983)." *Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255, 1262

(Ct. Int'l Trade 2021).  *See also Novosteel SA v. United States*, 284 F.3d

1261, 1276 (Fed. Cir. 2002)  ("As the Supreme Court noted in *Bowen v.*

*American Hospital Ass'n*, agency deference has not come so far that

agency action is upheld whenever it is possible to conceive a basis for

administrative action.").

Even the case that the *Al Ghurair* Court cites to support its

position on the breadth of Commerce's discretion was one that

concentrated on the question as to whether Commerce abused its

37

discretion.   *See Al Ghurair*, 536 F. Supp. 3d at 1368 citing to *Timken Co. v. United States*, 968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014), aff'd without opinion, 589 F. App'x 995 (Fed. Cir. 2015).

To be clear, the HLD Companies do not question that Commerce has discretion to decide its methodologies in evaluating the circumvention criteria in 19 U.S.C. § 1677j(b), and that Commerce must make its determinations on the specific facts of the case, or that a comparison methodology provides context to Commerce's evaluation of investments, production facilities, and operations.  Rather, the HLD Companies argue that the selected comparison object in this case, integrated steel mills, is arbitrary and capricious because the steel mill industry producing the primary forms of steel is too different from the OCTG producing industry to deliver reasonable results and conclusions from the comparison.  Commerce has compared apples to oranges in this case.  Even though both apples and oranges are fruits and both grow on trees, and a consumer of fruit can reasonably prefer apples over oranges and eat only apples, it would make no sense for the apple eater to conclude that oranges are bad apples, or not genuine fruit, or even question that oranges exist.  So here – even though investments for a

facility for the manufacture of OCTG may be less than for an integrated steel mill, the production facilities smaller, and production processes different, Commerce's conclusion that the production of OCTG is a mere finishing operation in the production of hot-rolled steel in an integrated mill is a logical fallacy.

This Court should reject Commerce's comparison of the HLD Companies' OCTG investments and operations with those of Chinese integrated steel mills and remand this case to Commerce with instructions to compare the HLD Companies' investments and operations with those of the Chinese non-integrated OCTG producers, using the information on the record of this case.

## B. The HLD Companies' Manufacturing Processes in Brunei and the Philippines are Not Mere Assembly or Completion Operations.

In its final determination, Commerce concluded that the HLD Companies' "process of assembly or completion in Brunei or the Philippines was minor compared to that of integrated steel mills in China."  Final IDM at 13, **Appx01014**.  As the HLD Companies noted in their case brief, the Domestic Producers of OCTG, who are Defendant-Intervenors in this case, must have blanched at Commerce's characterization of their manufacturing operations as minor and

insignificant because none of the Defendant-Intervenors are integrated producers of primary steel forms or of the hot-rolled steel used in their own production of OCTG.  *See* HLD Case Brief at 2-3, **Appx03791-03792**.  Neither Commerce nor Defendant-Intervenors addressed this fact.  *See* Domestic Producers' Rebuttal Brief (Sept. 23, 2021), **Appx04651-04669**.  Nevertheless, Defendant-Intervenors consider their investments and operations to be important enough to protect their assets by investing yet more money to participate in numerous anti-dumping and countervailing duty investigations and reviews before the ITC and Commerce.  *See* HLD Case Brief at 3, **Appx03792**, for references to just a few of the numerous ITC investigations and reviews of OCTG from various countries.

Commerce and Defendant-Intervenors also did not acknowledge or grapple with the fact that the U.S. OCTG industry as petitioners in the original ITC investigation of OCTG from China described their production process as beginning with a "forming phase" and progressing through numerous stages in a "finishing phase."  The original petition described the production process as follows:

> The manufacturing process for OCTG consists of the forming phase and the finishing phases. The forming phase takes

place entirely at the manufacturing facility or mill. The finishing phase, however, may take place at the mill, at a wholly owned processing or threading facility, or at an independent processing or threading facility.

### a. Forming Phase

Casing and tubing are manufactured either by a seamless process or by the ERW process.[23]

### ERW process

The ERW process starts with hot-rolled steel sheet in coil form.[24] The steel sheet is slit to the exact width needed to form a tube of the desired diameter. The slit sheet is formed into tubular shape by passing it through a series of rollers while cold.[25] The edges are then heated by electrical resistance and welded by heat and pressure, without the addition of filler metal. The welding pressure causes some of the metal to be squeezed from the joint, forming a bead of metal on the inside and the outside of the tube. This bead, or welding flash, is usually trimmed from both the outside and the inside surfaces.

### Seamless process

. . .

### b. Finishing Phase

After the OCTG is formed it goes through the finishing phase. [29] The finishing phase may involve heat treatment of the OCTG. Alloy OCTG and some carbon OCTG require heat treating, which may involve one or more heating cycles either in a continuous furnace or in a batch furnace, with controlled rates of cooling. Specific heat treating requirements depend on the grade of steel being processed. For welded pipe, the heat treatment (which may be done while the pipe is still in the continuous procession line) may cover the welded seam only or the full cross-section of the pipe. Subsequently, sizing rolls will shape the tube to accurate diameter tolerances. The product is cooled and then cut to length at the end of the tube mill.[30]

Casing and tubing are also finished by threading and the attachment of a suitable coupling to one end of each length. For some casing or tubing that is subject to severe or sour service, it is necessary to provide additional strength in the joint, and for this reason, the ends of the pipe are upset before the threads are cut. In the upsetting process, the end of the pipe is heated to forging temperature, and is then inserted endwise into an upsetting machine. The machine pushes the hot metal back, creating a thicker wall at the end of the pipe. The upsetting may be controlled to displace the extra thickness to the inside or to the outside of the pipe.[31]

Finishing operations on casing and tubing are often performed by specialists called "processors" and "threaders" rather than by pipe manufacturers. Processors operate facilities that are capable of full body heat treatment as well as upsetting ends. Threaders are capable of threading and coupling, hydrostatic testing, and measuring the length of OCTG products. Most processors are also threaders but there are many threaders that are not processors. Some processors and threaders may also manufacture couplings that become part of the finished OCTG.

*Certain Oil Country Tubular Goods from the People's Republic of China*, Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Section 701 and 731 of the Tariff Act of 1930, As Amended, Vol. I (April 8, 2009) at 8-10, filed by Wiley Rein LLP, Meagher & Flom LLP, and Schagrin Associates on behalf of Petitioners Maverick Tube Corporation, United States Steel Corporation, V &M Star LP, V &M Tubular Corporation of America, TMK IPSCO, Evraz Rocky Mountain Steel, Wheatland Tube Corp., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO-CLC.  ("OCTG China Petition").  As the HLD Companies noted in their case brief, this is an impressive list of U.S. OCTG producers and their legal counsel who all agree that the manufacture of OCTG consists of a "forming phase" and "finishing phase" and does not include the production of the hot-rolled steel input at integrated steel mills.  *See* HLD Case Brief at 5, **Appx03794**.  *See* also Initiation Memo at Exhibit 2, **Appx03854-03860.**

As the HLD Companies reported in their questionnaire responses, they perform all of the manufacturing processes, from start to finish, that are performed and reported by the U.S. OCTG industry and reported by the ITC.  *See* HLD Case Brief at 5-6, **Appx03795-03796**, for the documents on the administrative record pertaining to the HLD Companies' production processes.  Neither Commerce nor Defendant-Intervenors have questioned the extent of the HLD Companies' production processes nor claimed that the HLD Companies' documentation is in any respect deficient.

In its finding of circumvention in the underlying case, Commerce has lost sight of the statute's intention to address *instances of assembly or completion of an article* in a third country that is minor and

insignificant.  The first question to resolve is therefore whether the

HLD Companies' manufacturing processes are mere assembly or

completion operations.  Only if the answer is "yes" to this first question

does the second question arise as to whether the assembly or completion

is minor or insignificant.  See 19 U.S.C. 1677j(b)(1)(B)&(C):

"if . . .

(B) before importation into the United States, such imported

merchandise is completed or assembled in another foreign country . . .

(C) the process of assembly or completion . . . is minor or

significant."

Commerce began its analysis in its circumvention inquiry of the

HLD Companies' production of OCTG, however, with the second

question as to whether the HLD Companies' manufacturing operations

are minor and significant compared to the operation of an integrated

steel mill.  Only then did Commerce conclude that because the HLD

Companies' operations are minor and significant, according to its faulty

comparison, they are only assembly and completion operations.  Final

IDM at 12-13, **Appx01013-01014**.  Commerce's methodology in its

"assembly or completion" analysis is backwards and simply not

44

supported by the structure of the circumvention statute or legislative history.

We must therefore turn the analysis around to consider whether the HLD Companies' production operations can be considered assembly or completion or similar operations.  The SAA describes a circumventing exporter as engaging in only screwdriver operations:

> Section 230 of the bill amends existing sections 781(a) and 781(b) of the Act which address the circumvention of antidumping or countervailing duty orders through the establishment of screwdriver assembly operations in the United States or a third country, respectively. Sections 781(a)(1) and 781(b)(1) (the so-called mandatory factors) focus the inquiry on whether: (1) minor or insignificant assembly or completion is occurring in the United States (or a third country); and (2) the value of the parts imported into the United States (or a third country) from the country subject to the order is a significant proportion of the total value of the finished product.

SAA at 4216.

Although the SAA makes clear that Commerce is to consider the "particular circumvention scenario" in its analysis of the factors in 19 U.S.C § 1677j(b), equally clear is that the starting point is to ask whether the manufacturing process at issue is comparable to screwdriver operations.  In such operations, all finished parts are delivered to an assembly site or line, ready to assemble with tools no

more sophisticated than a screwdriver.  As the HLD Companies have reported and documented, their operations cannot be compared to such assembly lines or operations.  *See* discussion in HLD Case Brief at 13-15, **Appx03802-03804.**  The SAA "represents an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements, both for purposes of U.S. international obligations and domestic law," SAA at 4040.  Commerce's discretion does not extend to ignoring the language of the statute (assembly, completion, minor, insignificant) nor the SAA's explanation of the statute's intent to address screwdriver operations in the U.S. and in third countries.

In the *Macao Commercial* case, the Court found that distinguishing between "manufacturing" and "assembly or completion" in Commerce's application of the circumvention law was mere semantics and that Commerce could use its discretionary authority to interpret the terms as it saw fit.  *See Macao Commer. & Indus. Spring Mattress Mfr. v. United States*, 437 F. Supp. 3d 1324, 1329-1330 (Ct. Int'l Trade 2020).  The Court fails to acknowledge that Commerce may not abuse its discretionary authority, and Commerce's interpretation of

the statute may not be arbitrary and capricious.  Words have meaning, and the assumption is that Congress used the terms "assembly" and "completion" for a reason other than mere semantics.  The SAA gives one interpretation of the terms with its reference to "screwdriver operations."  SAA at 4216.

According to a somewhat older case before the U.S. Customs Court:

> It is apparent that the judicial and lexicographic definitions of "assembly," as well as the Customs Regulations, envision an assembly which requires finished manufactured or fabricated components which are "joined" together to form an article. Clearly, "assembly" does not include the manufacture, production or fabrication of the essential parts to be used in the assembly process.

*Zwicker Knitting Mills v. United States*, 82 Cust. Ct. 34, 44 (U.S. 1979).

The Merriam Webster online dictionary provides the following definition for "assembly":

> 6a: the fitting together of manufactured parts into a complete machine, structure, or unit of a machine;
> the assembly of an automobile

https://www.merriam-webster.com/dictionary/assembly (last accessed June 4, 2022).  In our instant case, Commerce does not, and cannot, explain what the finished component parts are that the HLD

Companies only need to "assemble" in their manufacturing process. An OCTG operation might be considered an assembly if the processor imported from China finished welded pipe and finished coupling and attached the coupling to one end of each pipe length in the third country. The HLD Companies, however, manufacture their welded OCTG from sheets of steel, and no assembly of pre-fabricated parts is involved in their manufacturing processes. *See, e.g.,* HLDSB Supp. Rsp. at Ex. SQ1-9.2, **Appx03668-03673**, and HLD Clark Supp. Rsp. at Ex. SQ1-6.2, **Appx03419-03424**. Thus, the HLD Companies' operations are not an "assembly" within the common understanding of the term.

Merriam Webster's online dictionary defines "complete" as follows"

Definition of complete (Entry 2 of 2)
transitive verb
1: to bring to an end and especially into a perfected state; complete a painting

https://www.merriam-webster.com/dictionary/complete (last accessed June 4, 2022). In this case, something must have been started in order to bring it to an end or completion. Commerce does not explain, however, what exactly is being completed in the HLD Companies' production of OCTG. Commerce has not explained whether it believes

that unfinished hot-rolled steel is completed into finished hot-rolled steel or whether the hot-rolled steel is in reality unfinished OCTG that is finished at the HLD Companies' factories.

In this instant case, the circumstance that the HLD Companies' finished OCTG is not a "completion" of a recognizable unfinished product to a finished product distinguishes it from the merchandise at issue in the cases discussed above.  In the small diameter graphite electrodes case, the inquiry merchandise was unfinished graphite electrodes, SDGE Final, 77 Fed. Reg. 47596-47598; in the polyethylene retail carrier bags case, the inquiry merchandise was unfinished polyethylene bags, PRCB PDM 1-2; in *Bell Supply*, the subject merchandise was green pipe, ultimately found to be unfinished OCTG, *Bell Supply VI*, 393 F. Supp. 3d at 1244; and in the *Peer Bearing* case, the merchandise at issue were unfinished cups and cones, machined in the third country and then assembled with other components into a finished tapered roller bearing.  *Peer Bearing*, 986 F. Supp. 2d at 1394. In sum, the HLD Companies' production of OCTG is neither an "assembly" nor "completion" under any reasonable interpretation of the terms.

49

Commerce refers several times to the HLD Companies' OCTG manufacturing operations as "assembly or completion" processes. *See* Final IDM at 6, 10, 13, **Appx01007, Appx01011, Appx01014**. Commerce also describes these "assembly or completion" processes as consisting of slitting, welding, forming, heat treatment, cooling, and quality control without drastic changes to the length and width, and no changes to the thickness, of the product as in the production of hot-rolled steel. Commerce does not explain what it means by "drastic" changes or explain what changes, although perhaps not drastic, are actually made to the hot-rolled steel. *Id.* at 13, **Appx01014**.

First, Commerce is incorrect that no substantial changes are made to the length. As stated above in the OCTG production process description from the initial petition, hot-rolled steel is delivered in coils. *See also* Initiation Memo at Exhibit 2 p. I-14, **Appx03854**. As can be seen in the illustration of the production process for welded casing and tubing, the coiled steel is fed into the rolling, forming, and welding processes, and the formed tube is then cut to length. *Id.* at I-16, **Appx03856.** This appears to be a drastic change to the length of the hot-rolled steel coil input by any definition. Regarding the width, one of

the first processes performed on the steel sheet is to slit it to a width required for manufacturing the specific diameter of the pipe that is being produced at the time.  *Id.* at I-14, **Appx03854**; HLDSB Supp. Qre Rsp. at Ex. SQ1-9.2, **Appx03670**; HLD Clark Supp. Are Rsp. at Ex. 6.2, **Appx03421**.  Thus, the width of the hot-rolled steel undergoes a substantial change, whether or not "drastic."

Most significantly, Commerce does not even mention that the form of the hot-rolled steel undergoes a substantial change from a flat sheet to a tubular form, the essential characteristic of a pipe, tube, or casing. The fact that the OCTG manufacturing process of making the tubular form of the product is the step that produces the essential characteristic of OCTG is *exactly* the argument that Commerce made in the *Bell Supply* litigation.  As stated in *Bell Supply VI*:

> such findings align with Commerce's determination that the major physical and chemical properties of both finished and unfinished OCTG are imparted during the steel forming process, that the essential component of the merchandise is the green tube produced in the PRC, and that it is the physical and chemical characteristics of green tube that determine the product's ultimate use as OCTG.

*Bell Supply VI*, 393 F. Supp. 3d at 1244.  Commerce's failure to acknowledge that the HLD Companies' OCTG manufacturing process

"drastically" changed the form of the hot-rolled steel sheet input to a new and different tubular product renders Commerce's analysis of the OCTG production process of little value.  Namely, Commerce's analysis and final determination are not based upon substantial evidence and are unreasonable because Commerce failed to consider an important aspect of the production process issue.  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Moreover, in its assembly and completion analysis, Commerce altogether failed to consider that OCTG is not "finished hot-rolled steel," and hot-rolled steel is not "unfinished OCTG."  The HLD Companies' OCTG manufacturing process turns a sheet of steel into a finished oil country tubular good that is ready to be put into service as a tube or casing.

In the *Peer Bearing* case, the Court considered whether tapered

roller bearings ("TRBs) processed in Thailand, whereby unfinished cups and cones from China were exported to Thailand to be finished by machining and assembled with other components into completed TRBs, were within the scope of the AD order on TRBs from China. *Peer Bearing*, 986 F. Supp. 2d at 1393, 1394. The Court found that the TRBs from Thailand were not within the order on TRBs from China, and stated that the situation was one addressed by the anti-circumvention statute in 19 U.S.C. § 1677j(b). *Id* at 1398-1399. The *Peer Bearing* Court found that although Commerce was authorized in circumvention proceedings to enlarge the scope of an antidumping order, the statute limited Commerce's authority to place within an Order merchandise assembled in a third country. *Id*. at 1400-1403. The Court then found that had Commerce elected to conduct a circumvention proceeding in Peer Bearing's case, and that the agency had slim chances of success. *Id*. at 1403-1405. The Court concluded:

> While it is apparent from the record evidence that the question posed by this case was of a type Congress intended Commerce to address under paragraphs (A) and (B) of § 1677j(b)(1), the same record evidence demonstrates that the processing in Thailand extended beyond a process of "assembly or completion," the term the statute applies in paragraph (C) of § 1677j(b)(1). The processing included, prior to any assembly operations, the grinding and honing of cups and cones that, upon exportation from

China, were not functional cups and cones ready for assembly. Because no unfinished or incomplete bearings were exported to Thailand, the Thai operations cannot fairly be characterized as merely a "completion" process.

*Id.* at 1405-1406.

In sum, the *Peer Bearing* Court found that Congress understood that with the circumvention statute's granting of authority to Commerce to expand AD/CVD Orders beyond their initial scope, at the same time the statute placed limits on this extraordinary authority. One such limit of Commerce's authority is to address third-country processing that is, truly, only assembly and completion operations. The HLD Companies' manufacturing of OCTG far exceeds the intended addressee of third-country processing.

### C. Commerce Has Not Properly Considered Whether it is Appropriate in this Case to Find Circumvention, 19 U.S.C. § 1677j(b)(1)(E).

As with the other criteria listed under 19 U.S.C. § 1677j(b)(1)(A) – (D), the Department's affirmative finding of "appropriateness" is necessary to a final conclusion of circumvention. According to the structure of the statute, the status of 19 U.S.C. § 1677j(b)(1)(E) is equal to that of the preceding provisions in (A) through (D).

The HLD Companies believe that a finding of circumvention in

this case not appropriate.  Notably, the combined imports of welded OCTG from Brunei and the Philippines account for less than 5% of all imports from all countries.  Initiation Memo at Ex. 4, **Appx03865**.  This figure does not even include in-scope seamless pipe.  *Id.* at 2 (scope of the Orders) & 3, FN 7, **Appx03838**, **Appx03839**.  Since the HLD Companies produce only welded OCTG, their share of U.S. imports of OCTG decreases considerably.  In addition, the U.S. producers' market share of the like product, consisting of both welded and seamless OCTG, is currently over 50%.  *See Oil Country Tubular Goods from China*, Invs. 701-TA-463 and 731-TA-1159 (Second Review), USCIT Publ. 5136 (November 2020) at I-27 and I-30.  These considerations indicate that OCTG from Brunei and the Philippines have only a minimal presence on the U.S. market.  *See* 19 U.S.C. 1677(24), defining imports of subject merchandise below 3% as "negligible."  The Department has not explained why it is appropriate to target this negligible volume of all OCTG sold in the U.S. market to provide relief to the U.S. industry.

Further, the Department has not adequately explained why it self-initiated this anti-circumvention inquiry.  *See* Initiation Notice at 85 Fed. Reg. 71,877, **Appx03952**.  Before initiation, the Department

consulted with several members of the U.S. OCTG Industry.  *See* Dep't

Commerce, Memorandum re: *Oil Country Tubular Goods from the*

*People's Republic of China: Circumvention of the Antidumping and*

*Countervailing Duty Orders*: Call with Domestic Industry Counsel

(representing Maverick Tube Corporation, Tenaris Bay City, Inc.,

IPSCO Tubulars Inc., and Benteler Steel/Tube Manufacturing Corp.)

(Nov. 3, 2020), **Appx03930**; Dep't Commerce, Call with Domestic

Industry Counsel (representing United States Steel Corporation) (Nov.

3, 2020), **Appx03931**; and Dep't Commerce, Call with Domestic Industry

Counsel (representing Vallourec Star, L.P. and Welded Tube USA, Inc.)

(Nov. 3, 2020), **Appx03932**.

The Department's memoranda concerning their contact with

members of the U.S. OCTG industry do not indicate the substance of

the discussions.  Nevertheless, no member of the domestic industry

decided itself to file an anti-circumvention inquiry request and seek

relief from Bruneian and Philippine OCTG imports, and the

participation of the domestic industry in this inquiry has been tepid at

best.  Only three members of the domestic industry have entered

appearances in the proceedings and participated in these proceedings.

*See* Final IDM at 15, **Appx01016.** It appears that, generally, the

domestic OCTG industry members do not believe they are injured or

threatened with injury by the small amount of OCTG imports from

Brunei and the Philippines to a degree that would warrant their ardent

participation in the Department's self-initiated inquiry.

Further, in the past, the Department has self-initiated AD and

CVD proceedings, including anti-circumvention proceedings under 19

CFR § 351.225(b), only sparingly. In its final determination in a recent

self-initiated CVD investigation, the Department justified its self-

initiation as follows:

> AD and CVD investigations are normally initiated through a
> petition procedure. This case represents an exception rather
> than the norm because of the unusual facts involving a rapid
> increase in import volumes over the last three years and a
> "systemic and significant over-capacity in the Chinese
> aluminum industry," as stated in the initiation notice.
> Commerce stated in the initiation notice that it expects most
> of the subsequent investigations to normally proceed based
> on petitions filed by or on behalf the industry.

*Common Alloy Aluminum Sheet from the People's Republic of China,*

*Countervailing Duty Investigation:* Final Affirmative Determination, 83

Fed. Reg. 57,427 (Dep't Commerce, Nov. 15, 2018) and accompanying

Issues and Decision Memorandum for the Final Determination at 20.

In this anti-circumvention inquiry on OCTG from Brunei and the Philippines, the "exception" to the norm and "the unusual facts" remain a mystery.  To be sure, the Department notes that imports from Brunei and the Philippines together increased from 2.8% to 4.9% during the period of inquiry, 2017 through November 2020.  Initiation memo at 9, **Appx03845**.  But, as discussed above, in terms of U.S. market share of all merchandise, both imported and domestically produced welded and seamless OCTG, the current presence of Bruneian and Philippine OCTG on the U.S. market is miniscule.

The Department also notes a rise in imports of hot-rolled steel exported from China to Brunei and the Philippines.  *Id.*  As discussed above, however, HR steel is not an unassembled or incomplete oil country tubular good.  HR steel has a variety of uses, and it lies within the domain and sovereignty of the foreign governments to regulate their trade with one another.  The question remains unanswered as to why the Department inappropriately chose to target Bruneian and Philippine OCTG with an anti-circumvention inquiry when little or no interest in protecting U.S. interests or the U.S. OCTG industry is apparent.

Commerce answers the HLD Companies' arguments on appropriateness of action under the circumvention statute by stating that the statute does not require Commerce to consider any of the factors that the HLD Companies argue contribute making action inappropriate. Final IDM at 15-16, **Appx01016**. Basically, Commerce argues that because it found circumvention under the (A)-(D) criteria, it must not consider any further factors under (E). Similarly, the *Al Ghurair* Court states:

> Rather, section 781(b)(1)(E) of the Act provides that before issuing an affirmative circumvention determination Commerce should 'determine{} that action is appropriate . . . to prevent evasion' of the relevant AD/CVD orders at issue. Nowhere does the statute indicate that 'evasion' must be intentional, or that a respondent in the third country must have the 'intent' to evade duties. According to AGIS's interpretation of the Act, even if circumvention of an AD or CVD order exists, Commerce must also — through some undefined means — ascertain a respondent's intent to evade duties before it may determine that circumvention has occurred.

*Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1370 n.2 (Ct. Int'l Trade 2021).

The problem with Commerce's and the *Al Ghurair* Court's reasoning is that it is circular: "because we found circumvention, action is appropriate to prevent evasion." But 19 U.S.C. § 1677j(b)(1)(E) and

the structure of the circumvention statute require that the agency *first* find that action is appropriate *before* finding that circumvention exists. The fact that the statute does not enumerate the criteria for "appropriateness" does not relieve Commerce from its mandatory obligation to consider the factors in the concrete case that indicate action is appropriate or not appropriate.  Commerce's position that it can dispense with 19 U.S.C. § 1677j(b)(1)(E) if it finds the criteria in (A)-(D) fulfilled is simply wrong.  Commerce must answer the question as to why circumvention exists when the HLD Companies' exports of OCTG to the United States are too insignificant to injure the U.S. domestic industry.  Stated another way, Commerce must justify why it overturned the ITC's well-reasoned exclusion of these two countries as de minimis from its affirmative injury determinations.  The Court should not countenance this agency overreach.

## VI    CONCLUSION AND PRAYER FOR RELIEF

Accordingly, Commerce's findings that the HLD Companies' manufacture of OCTG was circumventing the AD/CVD Orders on OCTG was not justified or reasonable and not supported by record evidence. Commerce's comparisons were inappropriate and failed to consider important aspects of the problem, including whether the HLD

60

companies could fairly be characterized as engaged in mere assembly of HR steel into OCTG. The Court should therefore remand this case to Commerce with instructions to find that the HLD Companies did not circumvent the AD/CVD Orders on OCTG from China.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman*
Vivien J. Wang**
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel:   (202) 783-6900
Date:  June 6, 2022                                        email: gmenegaz@dhlaw.com
*Counsel for Plaintiffs*

---

* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

** Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (14-point Century font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains <u>12,281</u> words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz
_____
Gregory S. Menegaz
DEKIEFFER & HORGAN, PLLC
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs HLDS (B) Steel Sdn Bhd and HLD Clark Steel Pipe Co., Inc.*