# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| _____ ) | |
| HLDS (B) STEEL SDN BHD AND ) | |
| HLD CLARK STEEL PIPE CO., INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | Court No. 21-00638 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| WELDED TUBE USA, INC., ) | |
| WHEATLAND TUBE COMPANY, ) | |
| AND VALLOUREC STAR L.P., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____) | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment upon the administrative record, responses thereto, replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's determinations are sustained in all respects.

Dated: _____                    _____
      New York, New York                                              JUDGE

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| _____ | ) | |
| HLDS (B) STEEL SDN BHD AND | ) | |
| HLD CLARK STEEL PIPE CO., INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Court No. 21-00638 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WELDED TUBE USA, INC., | ) | |
| WHEATLAND TUBE COMPANY, | ) | |
| AND VALLOUREC STAR L.P., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy
Assistant Attorney General

PATRICIA M. McCARTHY
Director

                              By:   /s/ Claudia Burke
                                    CLAUDIA BURKE
                                    Assistant Director

OF COUNSEL:                         /s/ Hardeep K. Josan
PAUL K. KEITH                       HARDEEP K. JOSAN
Senior Attorney                     Trial Attorney
Office of the Chief Counsel         U.S. Dept. of Justice
for Trade Enforcement               Civil Division
and Compliance                      Commercial Litigation
U.S. Department of Commerce         Branch
                                    26 Federal Plaza, Rm. 346
                                    New York, New York l0278
                                    Tel. No. 212-264-9230 or 9245

August 5, 2022                      *Attorneys for Defendant*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...........................................2

I.    Administrative Determinations Under Review.............................2

II.   Issues Presented For Review.......................................................2

STATEMENT OF FACTS................................................................3

SUMMARY OF ARGUMENT..........................................................7

ARGUMENT..................................................................................9

I.    Applicable Legal Framework.....................................................9

      A.    Standard Of Review............................................................9

      B.    Legal Framework For Circumvention Inquiries ................12

II.   Commerce's Comparison Of The HLD Companies' Production Of
      OCTG To The Production Processes Of Hot-Rolled Steel By
      Integrated Steel Mills Is Supported By Substantial Evidence And
      In Accordance With Law..............................................................16

III.  Commerce's Conclusion That The HLD Companies' Assembly Or
      Completion Of OCTG In Brunei And The Philippines Is Minor Or
      Insignificant Is Supported By Substantial Evidence And In
      Accordance   With Law ...............................................................27

IV.   Commerce Reasonably Determined That Action Is Appropriate To
      Prevent Evasion Of The Orders, Pursuant To 19 U.S.C. §
      1677j(b)(1)(E) ............................................................................40

CONCLUSION.............................................................................44

i

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Al Ghurair Iron & Steel LLC v. United States,*
    536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)................................19, 20

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984)...........................................................10

*Bell Supply Co. LLC v. United States,*
    888 F.3d 1222 (Fed. Cir. 2018)...........................................................38

*Bell Supply Co., LLC v. United States,*
    393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019)...........................35, 36, 37

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984).....................................................................11, 12

*Cleo Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007)...........................................................11

*Consolidated Edison Co. v. NLRB,*
    305 U.S. 197 (1938)..............................................................................9

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)..............................................................................9

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)..................................................9, 10, 19

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006).......................................11

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015)...........................................................19

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006)..............................................................9, 10

*Peer Bearing Co.-Changshan v. United States,*
  128 F. Supp. 3d 1304 (Ct. Int'l Trade 2015)........................................39

*Peer Bearing Co.-Changshan v. United States,*
  986 F. Supp. 2d 1389 (Ct. Int'l Trade 2014)..................................38, 39

*Pesquera Mares Australes Ltda. v. United States,*
  266 F.3d 1372 (Fed. Cir. 2001)..............................................................12

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
  966 F.2d 660 (Fed. Cir. 1992)................................................................12

*Timex V.I., Inc. v. United States,*
  157 F.3d 879 (Fed. Cir. 1998)................................................................11

*Timken Co. v. United States,*
  699 F. Supp. 300 (Ct. Int'l Trade 1988)...............................................11

*Timken v. United States,*
  354 F.3d 1334 (Fed. Cir. 2004)..............................................................12

## Statutes

19 U.S.C. § 1516a(b)(1)(B) ........................................................................9

19 U.S.C. § 1677j..........................................................................*passim*

19 U.S.C. § 1677j(b) ......................................................... 7, 8, 12, 37

19 U.S.C. § 1677j(b)(1) .................................................................5, 13, 40

19 U.S.C. § 1677j(b)(1)(A) .......................................................................5, 7

19 U.S.C. § 1677j(b)(1)(B) ...........................................................5, 7, 25, 26

19 U.S.C. § 1677j(b)(1)(C) ...............................................................*passim*

19 U.S.C. § 1677j(b)(1)(D) ...............................................................6, 7

19 U.S.C. § 1677j(b)(1)(E) ...............................................................3, 7, 8, 40

19 U.S.C. § 1677j(b)(2) ...............................................................*passim*

19 U.S.C. § 1677j(b)(2)(A)-(E) ...............................................................5

19 U.S.C. § 1677j(b)(2)(C) ...............................................................30

19 U.S.C. § 1677j(b)(3) ...............................................................6, 15, 40

19 U.S.C § 1677j(b)(3)(A) ...............................................................7

*Statement of Admin. Action, Accompanying the Uruguay Round
   Agreements Act (SAA),*
   H. R. Doc. No. 103-316, vol. 1, at 893 (1994)............... 14, 17, 30, 31, 32

*Omnibus Trade Act of 1987, Report of the Senate Finance Committee,*
   S. Rep. No. 100-71, at 101 (1987) .................................................15, 16

## **Regulations**

19 C.F.R. § 351.225(h)...................................................................13, 14

## **Other Authorities**

*Certain Oil Country Tubular Goods From the People's Republic of
   China,*         75 Fed. Reg 3203 (Dep't Commerce January 20, 2010)
   ...................................................................................*passim*

*Certain Oil Country Tubular Goods From the People's Republic of
   China,*         75 Fed. Reg. 28,551 (Dep't Commerce May 21, 2010) ....3

iv

*Small Diameter Graphite Electrodes From the People's Republic of China,*    77 Fed. Reg. 33,405 (Dep't Commerce June 6, 2012).....24

*Small Diameter Graphite Electrodes From the People's Republic of China,*    77 Fed. Reg. 47,596 (Dep't Commerce Aug. 9, 2012)...24, 25

*Polyethylene Retail Carrier Bags From Taiwan,*
79 Fed. Reg. 31,302 (Dep't Commerce June 2, 2014) ............. 24, 25, 26

*Polyethylene Retail Carrier Bags From Taiwan,*
79 Fed. Reg. 61,056 (Dep't Commerce Oct. 9, 2014)...........................24

*Certain Corrosion-Resistant Steel Products From the People's Republic of China,*
83 Fed. Reg. 23,895 (Dep't Commerce May 23, 2018)................... 19, 24

*Diamond Sawblades and Parts Thereof From the People's Republic of China,*    84 Fed. Reg. 33,920 (Dep't Commerce July 16, 2019).........35

*Certain Corrosion Resistant Steel Products From Taiwan,*
84 Fed. Reg. 70,937 (Dep't Commerce Dec. 26, 2019) .........................20

*Oil Country Tubular Goods From the People's Republic of China,*
85 Fed. Reg. 71,877 (Dep't Commerce November 12, 2020).................4

*Oil Country Tubular Goods From the People's Republic of China,*
86 Fed. Reg. 43,627 (Dep't Commerce August 10, 2021)......................4

*Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Determinations of Circumvention,*
86 Fed. Reg. 67,443 (Dep't Commerce Nov. 26, 2021)......................2, 7

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

———————————————————— )
HLDS (B) STEEL SDN BHD AND )
HLD CLARK STEEL PIPE CO., INC., )
)
Plaintiffs, )
)
v. )
)
THE UNITED STATES, )        Court No. 21-00638
)
Defendant, )
)
and )
)
WELDED TUBE USA, INC., )
WHEATLAND TUBE COMPANY, )
AND VALLOUREC STAR L.P., )
)
Defendant-Intervenors. )
————————————————————)

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiffs HLDS (B) Steel Sdn Bhd and HLD Clark Steel Pipe Co., Inc. (collectively, HLD Companies).  Plaintiffs challenge several aspects of the United States

Department of Commerce's (Commerce) final determinations of circumvention of the antidumping duty and countervailing duty orders on oil country tubular goods (OCTG) from the People's Republic of China (China). Plaintiffs' motion should be denied because Commerce's final determinations of circumvention are supported by substantial evidence and in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

## I.   Administrative Determinations Under Review

The administrative determinations under review are *Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Determinations of Circumvention*, 86 Fed. Reg. 67,443 (Dep't Commerce Nov. 26, 2021) (*Final Determinations*), Appx01000-01001, and accompanying Issues and Decision Memorandum (IDM), Appx01002-01021. The period examined in the circumvention inquiries covers January 1, 2017 to November 30, 2020.

## II.   Issues Presented For Review

1.   Whether Commerce's comparison of HLD Companies' production of welded OCTG to an integrated steel mill's production of hot-

rolled steel is supported by substantial evidence and in accordance with law.

2.   Whether Commerce's conclusion that the HLD Companies' process of assembly or completion in Brunei and the Philippines was minor or insignificant is supported by substantial evidence and in accordance with law.

3.   Whether Commerce reasonably considered the appropriateness of finding circumvention pursuant to 19 U.S.C. §1677j(b)(1)(E).

## STATEMENT OF FACTS

In 2010, Commerce issued antidumping duty and countervailing duty orders on imports of OCTG from China.  *See Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 28,551 (Dep't Commerce May 21, 2010) (amended final determ. of sales at less than fair value and antidumping duty order) (*AD Order*); *Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg 3203 (Dep't Commerce January 20, 2010) (amended final countervailing duty determ. and countervailing duty order) (*CVD Order*) (collectively, *Orders*).

On November 12, 2020, Commerce self-initiated anti-circumvention inquiries to determine whether certain imports of welded OCTG completed in Brunei or the Philippines using inputs of hot rolled steel manufactured in China are circumventing the antidumping and countervailing duty orders on OCTG from China. *See Oil Country Tubular Goods from the People's Republic of China*, 85 Fed. Reg. 71,877 (Dep't Commerce November 12, 2020) (notice of self-initiation of anti-circumvention inquiries), Appx03952.

On August 10, 2021, Commerce published its preliminary determinations that welded OCTG completed or assembled in Brunei or the Philippines using hot-rolled steel inputs manufactured in China and exported from Brunei or the Philippines to the United States are circumventing the antidumping and countervailing duty orders on OCTG from China. *See Oil Country Tubular Goods from the People's Republic of China*, 86 Fed. Reg. 43,627 (Dep't Commerce August 10, 2021) (prelim. affirmative determ.) (*Preliminary Determination*), Appx01022, and accompanying preliminary decision memorandum (PDM), Appx01025-01041; *see also* Preliminary Analysis Memoranda,

Appx01042-01049.  This determination was based on Commerce's application of statutory criteria under 19 U.S.C. § 1677j(b)(1).

Weighing the first two of five criteria, Commerce preliminarily concluded that the OCTG at issue is the same class or kind as merchandise that is subject to the *Orders*, and was completed or assembled in a foreign country (Brunei or the Philippines) using Chinese-origin hot-rolled steel.  PDM at 7-8, Appx01031-01032; *see* 19 U.S.C. § 1677j(b)(1)(A)-(B).

Considering the third criteria, Commerce preliminarily determined that the process of assembly or completion of OCTG in Brunei or the Philippines is minor or insignificant.  PDM at 8-13, Appx01032-01037; *see* 19 U.S.C. § 1677j(b)(1)(C).  This analysis involved consideration of five additional statutory sub-factors.  *See id.* § 1677j(b)(2)(A)-(E).  Specifically, Commerce found that the level of investment in Brunei or the Philippines is minor in terms of production facilities.  PDM at 9-10, Appx01033-01034.  The HLD Companies reported that they do not have separate research and development expenditures for the production of OCTG.  *Id.* at 10, Appx01034.  The nature of the production process, and the extent of the production

facilities in Brunei and the Philippines, are likewise insignificant. *Id.* at 10-12, Appx01034-01036. Finally, "the value of the processing performed in Brunei or the Philippines as a proportion of the value of the merchandise imported into the United States is small." *Id.* at 12, Appx01037.

Considering the fourth criteria, Commerce further preliminarily determined that the value of the Chinese-origin hot-rolled steel used by the HLD Companies to produce OCTG in Brunei or the Philippines represents a significant portion of the total value of the merchandise exported to the United States. *Id.* at 12-13, Appx01037-01038; 19 U.S.C. § 1677j(b)(1)(D).

Commerce then turned to consideration of additional factors in the circumvention statute. *Id.* at 14-16, Appx01038-01040; *see* 19 U.S.C. § 1677j(b)(3). Of note, Commerce preliminarily determined that both the pattern of trade in Brunei or the Philippines, including sourcing patterns, and evidence of increased imports of hot-rolled steel input from China into Brunei or the Philippines, supported a finding of circumvention of the *Orders*. *Id.* Additionally, the HLD Companies were affiliated with Chinese producers of OCTG. *Id.*

6

Finally, based on its analyses and conclusions under these factors, Commerce preliminarily determined that action is appropriate to prevent evasion of the *Orders* pursuant to 19 U.S.C. § 1677j(b)(1)(E). PDM at 16, Appx01040.

On November 19, 2021, Commerce issued its final determination that certain imports of welded OCTG completed in Brunei or the Philippines using imports manufactured in China are circumventing the *Orders*. *See Final Determinations*, Appx01000-01001. Commerce continued to find, pursuant to 19 U.S.C. § 1677j(b), that OCTG completed in Brunei or the Philippines from Chinese-origin hot-rolled steel are circumventing the *Orders* and should be considered within the scope of those orders. IDM, Appx01002. In support, Commerce reiterated the statutory framework and continued its conclusions from the *Preliminary Determination* with respect to the five statutory criteria, 19 U.S.C. §§ 1677j(b)(1)(A)-(E) and (b)(2), and other factors for consideration, *id.* § 1677j(b)(3)(A).

## SUMMARY OF ARGUMENT

Commerce's determination that OCTG completed or assembled in Brunei or the Philippines from Chinese hot-rolled steel is circumventing

the *Orders* is supported by substantial evidence and in accordance with law.  First, Commerce's methodology of comparing the production process of OCTG producers with the production process of integrated steel mills when analyzing the statutory criteria pursuant to 19 U.S.C. § 1677j(b) was reasonable.  Specifically, Commerce determined to evaluate the criteria under 19 U.S.C. § 1677j(b)(2) by comparing an integrated steel mill's production of hot-rolled steel with the HLD Companies' production of OCTG because "the total production process of welded OCTG begins with production of hot-rolled steel and the production of hot-rolled steel is thus in the context of the production of welded OCTG."  IDM at 8, Appx01009.

Second, in comparing the HLD Companies' experience with that of integrated steel mills, Commerce analyzed each of the criterion under 19 U.S.C. § 1677j(b)(2), and reasonably concluded that the process of assembly or completion in Brunei and the Philippines is minor or insignificant.

Finally, Commerce properly considered whether it was appropriate in this case to find circumvention, pursuant to 19 U.S.C. § 1677j(b)(1)(E).

For these reasons, Commerce's final determinations of circumvention should be sustained.

## ARGUMENT

## I.   Applicable Legal Framework

### A.   Standard Of Review

This Court sustains "'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1037 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Therefore, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel*

*Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted).  The Court should sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions.  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted).

"{T}he antidumping statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Fujitsu*, 88 F.3d at 1039 (internal quotation and citation omitted).  "Antidumping and countervailing duty determinations involve complex accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Id.* (citation omitted).  "This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous." *Id.*

10

The Court would not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). Accordingly, the Court should "not substitute its judgment for that of {Commerce} when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining "{i}t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency").

If an agency's construction of a statute is at issue, the Court is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* dictates that the Court "must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998) (citing *Chevron*, 467 U.S. at 842-43 & n.9). If the statute is silent or ambiguous with respect to an issue, the Court determines whether

11

Commerce's interpretation is based upon a reasonable construction of the statute. *Chevron*, 467 U.S. at 843. "{S}tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*." *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001); *Timken v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004). It is not the Court's duty to weigh the wisdom of Commerce's legitimate policy choices. *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992).

### B. Legal Framework For Circumvention Inquiries

Circumvention inquiries are governed by 19 U.S.C. § 1677j. There are several types of circumvention. As relevant here, Commerce may find circumvention exists when merchandise—of the same class or kind as that subject to an antidumping or countervailing duty order—is completed or assembled in a foreign country other than the country to which the order applies. *See id.* § 1677j(b). Commerce may find this type of circumvention if the merchandise assembled or completed in the

third country meets five primary statutory criteria under section

1677j(b)(1):

>   (A) {the} merchandise imported into the United
>   States is of the same class or kind as any
>   merchandise produced in a foreign country that is
>   the subject of . . . {an AD/CVD order},
>
>   (B) before importation into the United States,
>   such imported merchandise is completed or
>   assembled in another foreign country from
>   merchandise which . . . is subject to the order . . .,
>   or . . . produced in a foreign country . . . to which
>   such order . . . applies,
>
>   (C) the process of assembly or completion in the
>   foreign country . . . is minor or insignificant,
>
>   (D) the value of the merchandise produced in the
>   foreign country . . . is a significant portion of the
>   total value of the merchandise exported to the
>   United States, and
>
>   (E) action is appropriate . . . to prevent evasion of
>   such order . . . .

*Id.* § 1677j(b)(1); *see also* 19 C.F.R. § 351.225(h) (explaining that

Commerce "may include within the scope of an antidumping or

countervailing duty order, at any time such order is in effect, imported

merchandise completed or assembled in a foreign country other than

the country to which the order applies").

13

Whether the process of assembly or completion under section

1677j(b)(1)(C) is "minor or insignificant" further depends on five sub-

factors:

> (A) the level of investment in the foreign country;
>
> (B) the level of research and development in the foreign country;
>
> (C) the nature of the production process in the foreign country;
>
> (D) the extent of the production facilities in the foreign country;
>
> (E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

*Id.* § 1677j(b)(2).  No one single sub-factor is controlling. 19 C.F.R. §

351.225(h); Statement of Admin. Action, Accompanying the Uruguay

Round Agreements Act (SAA), H. R. Doc. No. 103-316, vol. 1, at 893

(1994). Commerce will evaluate each of the sub-factors depending on the

totality of the circumstances in the record before it.  *See* SAA at 893.

The statute further addresses whether merchandise assembled or

completed in a foreign country should be included within the scope of an

antidumping or countervailing duty order; this inquiry depends on

three sub-factors:

> (A) the pattern of trade, including sourcing patterns,
>
> (B) whether the manufacturer or exporter of the merchandise . . . described in {§ 1677j(b)(1)(B)} is affiliated with the person who uses the merchandise described in {§ 1677j(b)(1)(B)} to assemble or to complete in the foreign country the merchandise that is subsequently imported into the United States; and
>
> (C) whether imports into the foreign country of the merchandise described in {§ 1677(b)(1)(B)} have increased after the initiation of the investigation that resulted in the issuance of such order . . . .

*Id.* § 1677j(b)(3).

The legislative history of these circumvention provisions indicates that their purpose is to "authorize the Commerce Department to apply antidumping and countervailing duty orders in such a way as to prevent circumvention and diversion of U.S. law." Omnibus Trade Act of 1987, Report of the Senate Finance Committee, S. Rep. No. 100-71, at 101 (1987). Congress has expressed its intention that the circumvention statute "grant the Commerce Department substantial discretion in interpreting these terms, and invoking these measures, so as to allow it flexibility to apply the provisions in an appropriate

15

matter" and that Commerce use its authority "to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws." *Id.* at 100. "{A}ggressive implementation" of the circumvention laws "can foreclose these practices." *Id.*

## II.   Commerce's Comparison Of The HLD Companies' Production Of OCTG To The Production Processes Of Hot-Rolled Steel By Integrated Steel Mills Is Supported By Substantial Evidence And In Accordance With Law

Commerce's methodology of comparing the production process of OCTG producers with the production process of integrated steel mills when analyzing the statutory criteria was reasonable.

Commerce's circumvention determinations are supported by Commerce's reasonable conclusion that the HLD Companies' assembly or completion of OCTG in Brunei or the Philippines is minor or insignificant. *See* 19 U.S.C. § 1677j(b)(1)(C). As described above, to determine whether the process of assembly or completion in a third country is minor or insignificant, Commerce evaluates the five criteria provided by 19 U.S.C. § 1677j(b)(2). Here, in evaluating the statutory criteria, Commerce compared an integrated steel mill's production of hot-rolled steel with the HLD Companies' production of welded OCTG. *See* IDM at 6-11, Appx01007-01012. Because welded OCTG is produced

from hot-rolled steel, and given the capital-intensive nature of hot-rolled steel production, Commerce's comparison was reasonable in the circumvention context and "relevant to whether a producer would reasonably move its further processing across borders to avoid an order." IDM at 6, Appx01007.

Notably, the statute does not direct Commerce to consider the factors in any particular way and does not provide any objective thresholds for what might indicate that the process of assembly or completion is minor or insignificant. *See* 19 U.S.C. § 1677j(b)(2). As the SAA explains, "Commerce will evaluate each of these factors as they exist either in the United States or a third country, depending on the particular circumvention scenario. No single factor will be controlling." SAA at 893. Additionally, the SAA states that the "provisions do not establish rigid numerical standards for determining the significance of the assembly (or completion) activities . . . ." *Id.* at 894.

Accordingly, Commerce reasonably determined to evaluate the criteria under 19 U.S.C. § 1677j(b)(2) by comparing an integrated steel mill's production of hot-rolled steel with the HLD Companies' production of OCTG. *See* IDM at 6-11, Appx01007-01012. This

17

comparison reflected Commerce's practice to "compare the total investment required (as well as, separately, production processes and production facilities) from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required (as well as, separately, production processes and production facilities) to finish the final product in a third country, rather than to compare the investments (as well as, separately, production processes and productions facilities) required to perform the same finishing steps in each country." *Id.* at 9, Appx01010.  Commerce explained that, "{a}lthough the investment for welded OCTG, viewed in isolation, may not be considered significant, the total investment necessary to produce the subject merchandise gives context to that figure for purposes of considering whether that investment is indicative of circumvention." *Id.* at 6-7, Appx01007-01008.  In other words, "{a} proper analysis of the investment levels, production facilities, and production processes in Brunei and the Philippines cannot ignore the important steps necessary in the total production process of welded OCTG, starting from the production process of hot-rolled steel." *Id.* at 7, Appx01008.

Because the circumvention statute does not direct Commerce to evaluate the factors at 19 U.S.C. § 1677j(b)(2) using any particular procedure or methodology, Commerce's choice of methodology warrants "tremendous deference." *See Fujitsu*, 88 F.3d at 1039; *JBF RAK LLC*, 790 F.3d at 1363. Indeed, this Court has affirmed Commerce's comparative approach to analyzing the circumvention factors. *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021). In Commerce's final determination of circumvention of the antidumping and countervailing duty orders on corrosion-resistant steel products from China, Commerce compared the levels of investment by United Arab Emirates producers in cold-rolled steel and corrosion-resistant steel factories with a Chinese company's investment in integrated steel mills in China. *See Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 83 Fed. Reg. 23,895 (Dep't Commerce May 23, 2018) (affirm. final determ. of circumvention), and accompanying IDM at 34-35 (*CORES Final*). In sustaining Commerce's reasoning, this Court explained:

> A determination of the third country's portion of the total sum of investment is useful to gauge the level of investment {} in a third country. Comparative analysis helps also to ensure that

> larger companies with much smaller operations in
> a third country — operations that may appear
> significant in absolute terms given the size of the
> firm, but that comprise a small share of total
> operations — will not be able to elude an AD/CVD
> order simply on account of the firm's large overall
> size. Accordingly, a comparative analysis was
> reasonable.

*Al Ghurair*, 536 F. Supp. 3d at 1368. This Court further explained that
Commerce's methodology of comparing the entire production process to
the assembly or completion process is consistent with Commerce's past
practice. *See id.* at 1369 ("In previous cases involving investment in a
third country, Commerce used a similar type of comparative analysis
and arrived at similar conclusions." (citing, *e.g.*, *Certain Corrosion
Resistant Steel Products from Taiwan*, 84 Fed. Reg. 70,937 (Dep't
Commerce Dec. 26, 2019) (affirm. final determ. of circumvention))).
Therefore, Commerce's use of the same comparative methodology here
was reasonable.

The HLD Companies first take issue with Commerce's statement
that the comparison methodology is appropriate "because it is relevant
to whether a producer would reasonably move its further processing
across borders to avoid an order", IDM at 6, Appx01007, by arguing that
no such requirement exists in the statute. HLD Br. at 17-18. As an

initial matter, plaintiffs misinterpret Commerce's statement. Commerce was not drawing conclusions about intent or motive to circumvent an order, but rather emphasizing that it is reasonable to view the determination of whether the process of assembly or completion is minor or insignificant in a relative sense.

At any rate, as described above, Commerce is directed to consider whether the process of assembly or completion in the foreign country is minor or insignificant under 19 U.S.C. § 1677j(b)(1)(C) and, in making that determination, Commerce considers the factors listed in 19 U.S.C. § 1677j(b)(2).  Commerce's methodology for its analysis in this case, consistent with prior cases, was to make a comparison of the HLD Companies' production of welded OCTG with an integrated steel mill's production of the hot-rolled steel inputs.  IDM at 6, Appx01007. Because the statute does not provide guidance for what levels of activity regarding these factors in the foreign country would constitute minor or insignificant processing, Commerce reasonably used a comparison to the entire production process for the input product, *i.e.*, hot-rolled steel. *Id.*

Plaintiffs next argue that a comparison of investments of the HLD Companies' facilities to the investments of integrated steel production facilities in China is inappropriate because the investments of the integrated steel facilities in China are not exclusively used for OCTG production. *See* HLD Br. at 19. According to plaintiffs, Commerce should have either included "integrated mills that are dedicated solely to the production of finished OCTG" in its analysis, HLD Br. at 20, or compared the HLD Companies' levels of investment to those of Chinese OCTG producers. HLD Br. at 23-24. However, Commerce reasonably rejected plaintiffs' alternative comparison methodologies because they "dilute the large necessary initial investments required by the capacity of the integrated steel production facilities in China." IDM at 7, Appx01008. Specifically, as Commerce explained, Chinese integrated steel facilities require high thresholds of initial investment (ranging from $295 million to over $10 billion). *See* IDM at 7, Appx01008. Commerce relied on a 2015 OECD report to find that average investment for a Chinese integrated steel mill is $3.6 billion. *Id.* By contrast, information on the record regarding the HLD Companies' investments in their OCTG production facilities in Brunei and the

Philippines demonstrates "that they can be built on a much smaller scale (with record evidence showing investments comparatively low)." IDM at 7, Appx01009, (citing Preliminary Analysis Memoranda (August 4, 2021) at 2, Appx01043, Appx01047).

Commerce also explained that production quantity from the specific production lines submitted by the HLD Companies can change from time to time depending on the orders and the customers.  *See* IDM at 8, Appx01009.  Therefore, comparing the investments of the OCTG production in Brunei and the Philippines to investments used for the production of hot-rolled steel used only for OCTG is not a reliable basis to segregate the amount of the investment, the proportion of production, and the extent of the production facilities of a specific producer of hot-rolled steel required to supply the steel input to a typical OCTG producer.  *Id.*

Furthermore, as explained above, Commerce's past practice is to compare the total investment required from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required to finish the final product in a third country, rather than to compare the investments

required to prepare the same finishing steps in each country.  IDM at 9,

Appx01010 (citing *CORES Final* IDM at 35).  For example, in *Small*

*Diameter Graphite Electrodes (SDGE) from China*, Commerce compared

the level of investment required for a Chinese manufacturer to produce

an unfinished graphitized electrode to the level of investment needed by

the third country producer to perform its finishing processes.  *See Small*

*Diameter Graphite Electrodes from China*, 77 Fed. Reg. 33,405, 33,412-

13 (Dep't Commerce June 6, 2012) (preliminary circumvention

determination), *unchanged in Small Diameter Graphite Electrodes from*

*China*, 77 Fed. Reg. 47,596 (Dep't Commerce Aug. 9, 2012).  Similarly,

in *Polyethylene Retail Carrier Bags from Taiwan*, Commerce compared

the level of investment required of Taiwanese producer to produce

polyethylene film tubes with the level of investment for a domestic

producer in the United States to convert the polyethylene film tubes

into finished subject merchandise.  *See Polyethylene Retail Carrier Bags*

*from Taiwan*, 79 Fed. Reg. 31,302 (Dep't Commerce June 2, 2014)

(preliminary circumvention determination), and accompanying PDM at

9-10, *unchanged in Polyethylene Retail Carrier Bags from Taiwan,* 79

Fed. Reg. 61,056 (Dep't Commerce Oct. 9, 2014).

The HLD Companies' attempt at distinguishing *SDGE* and *Polyethylene Retail Carrier Bags* is unavailing.  Specifically, plaintiffs argue that *SDGE* is distinguishable because the inputs in that case were characterized as "unfinished artificial graphite," whereas here, hot-rolled steel cannot be characterized as "unfinished oil country tubular product."  *See* HLD Br. at 29.  The HLD Companies' argument fails to recognize, however, that Commerce's discussion in *SDGE* of whether the inputs were characterized as "unfinished artificial graphite" was unrelated to Commerce's comparative methodology under 19 U.S.C. § 1677j(b)(1)(C), and instead concerned whether the imported merchandise was completed from merchandise subject to the order or from merchandise produced in the foreign country that is subject to the order under 19 U.S.C. § 1677j(b)(1)(B).  *See SDGE*, 77 Fed. Reg. at 33,410.  Here, there is no dispute that the hot-rolled steel input is not within the scope of the *Orders*, but rather constitutes merchandise produced in the foreign country that is subject to the *Orders* (*i.e.*, China).  *See* PDM at 8, Appx01032.

Plaintiffs similarly argue that *Polyethylene Retail Carrier Bags* is distinguishable because the process that Commerce analyzed in that

case did not account for the production process of polyethylene resin pellets, the primary input in tubular polyethylene film, which in turn is the primary input in the polyethylene carrier bags. *See* HLD Br. at 30. Plaintiffs miss the point. In each proceeding, Commerce compared the production of the finished product (*i.e.*, polyethylene retail carrier bags and OCTG) to the production of the input (*i.e.*, tubular polyethylene film and hot-rolled steel). *See* IDM at 10, Appx01011. Although the HLD Companies argue that, in *Polyethylene Retail Carrier Bags*, Commerce did not start with the polyethylene resin pellets that are the input for tubular polyethylene film, Commerce similarly did not start its comparison here with the production of the inputs into hot-rolled steel (*e.g.*, iron ore). In other words, Commerce has consistently compared the production process for the finished product to the overall production process for that product by focusing on the production of the inputs "produced in the foreign country with respect to which such order or finding applies." *See* 19 U.S.C. § 1677j(b)(1)(B).

Therefore, Commerce's determination to compare the HLD Companies' level of investment, production facilities and production processes to the manufacture of OCTG in Brunei or the Philippines to

the manufacture of hot-rolled steel in integrated Chinese steel mills is reasonable and supported by substantial evidence.

## III.  Commerce's Conclusion That The HLD Companies' Assembly Or Completion Of OCTG In Brunei And The Philippines Is Minor Or Insignificant Is Supported By Substantial Evidence And In Accordance With Law

In comparing the HLD Companies' experience with that of integrated steel mills, Commerce reasonably concluded that the process of assembly or completion in Brunei or the Philippines is minor or insignificant.  Commerce analyzed each of the statutory criteria in turn.

First, Commerce compared the investments made by the HLD Companies in their production facilities in Brunei and the Philippines to the average investment amount of $3.6 billion to build an integrated hot-rolled steel facility in China and determined that the HLD Companies' investments were minor compared to that of an integrated steel mill.  PDM at 9-10, Appx01033-01034.

Second, Commerce considered that the HLD Companies reported that they do not have separate research and development expenditures concerning the production of OCTG.  *Id.* at 10, Appx01034.

Third, Commerce compared the nature of the production process of OCTG in Brunei and the Philippines to the production process of hot-

rolled steel in a fully integrated steel mill. *Id.* at 10-11, Appx01034-01035. After explaining the production processes for both products, Commerce determined that

> {t}he production of hot-rolled steel involves multiple high-intensity steps to turn raw materials into processed products – from iron ore to slab and to thick plate and to hot-rolled steel with different thickness and length in each product stage. When hot-rolled steel is sourced from China, the process of assembly or completion into OCTG in Brunei and the Philippines mostly consists of slitting, welding, forming, heat treatment, cooling, and quality control without drastic changes to the length and width, and no changes to the thickness, of the product as in the production of hot-rolled steel.

*Id.* at 11, Appx01035. Commerce therefore concluded that the production process in Brunei or the Philippines is far less intensive than it would be to produce OCTG without Chinese components (*i.e.*, to produce the steel and then use it in the production of the OCTG). *Id.*

Fourth, concerning the extent of production facilities, Commerce considered that the facilities required for making hot-rolled steel included oxygen furnaces and blast furnaces, and that the HLD Companies' facilities in Brunei or the Philippines are less extensive than the production facilities for hot-rolled steel in China. *Id.*

Finally, Commerce considered whether the value of the processing performed in Brunei or the Philippines represents a small proportion of the value of the OCTG imported into the United States. *Id.* at 12-13, Appx01036-01037. Commerce's calculations, which plaintiffs do not challenge, demonstrated that the value of the processing performed in Brunei and the Philippines as a proportion of the value of the OCTG imported to the United States is small. *Id.*; *see also* Preliminary Analysis Memoranda at 3, Appx01044, Appx01048. Based on its analysis of the five factors, Commerce reasonably determined that the process of assembly or completion in Brunei or the Philippines overall is minor or insignificant. PDM at 13, Appx01037.

The HLD Companies contend that production of OCTG in Brunei or the Philippines is not assembly or completion operations. Specifically, the HLD Companies argue that their production of welded OCTG is no less intensive than that of domestic OCTG producers in the United States. HLD Br. at 39-40. The HLD Companies further argue that their manufacture of OCTG is not comparable to "screwdriver operations" that they assert the circumvention statute is designed to address. HLD Br. at 45. Finally, the HLD Companies assert that their

29

production of OCTG is not consistent with dictionary definitions of "assembly" or "complete." *See* HLD Br. at 47-48. The HLD Companies' arguments are without merit because Commerce followed the statutory criteria and reasonably analyzed the factors provided by the statute.

The HLD Companies attempt to use semantics to insert a new requirement into the circumvention statute, *i.e.*, that the production in the foreign country must constitute assembly or completion. The HLD Companies' arguments ignore, however, that the statute already directs Commerce to consider the nature of the production process in the foreign country as part of its determination. *See* 19 U.S.C. § 1677j(b)(2)(C). Commerce analyzed the production process of OCTG in Brunei and the Philippines and found it to be relatively less intensive compared to the production of the hot-rolled steel inputs. *See* IDM at 12-13, Appx01013-01014.

The HLD Companies' argument that their production is no different than the U.S. OCTG producers also involves considerations not contained in the circumvention statute. There is nothing in the circumvention statute, the SAA, or Commerce's regulations directing

30

Commerce to compare the foreign companies' production process to that of the U.S. domestic industry.

The HLD Companies' reliance on dictionary definitions is similarly misplaced. Commerce's determination states that it covers "certain imports of OCTG *completed* in Brunei or the Philippines using inputs manufactured in China." IDM at 1 (emphasis added), Appx01002. Because the entire production process from start to finish for OCTG includes the production of the hot-rolled steel inputs, it is plain that the HLD Companies, which export welded OCTG, are "completing" that process by manufacturing welded OCTG from hot-rolled steel inputs. *See id.* at 12-13 (describing the process of assembly or completion for welded OCTG), Appx01013-01014.

The HLD Companies attempt to introduce still more extra-statutory considerations, stating that Commerce has "not explained whether it believes that unfinished hot-rolled steel is completed into finished hot-rolled steel or whether the hot-rolled steel is in reality unfinished OCTG that is finished at the HLD Companies' factories." HLD Br. at 48-49. Identifying an "unfinished" product is not required by the circumvention statute and is not mentioned in the SAA.

Moreover, such a requirement would run counter to the aim of the

circumvention statute because it would prevent a circumvention finding

whenever an input product could itself be considered a "finished"

product.  The SAA, however, provides the example of "electronic

products that rely on many *off the shelf* components."  SAA at 893.  A

product that might be considered "finished" can still be further

assembled or completed into a *different* finished product, and if such

assembly or completion is minor or insignificant, then it may still

circumvent an order.  Therefore, the HLD Companies' argument relies

on a notion of "complete" that would require the input product to be an

"unfinished" version of the completed product is neither supportable in

the statute nor elsewhere.

Regarding the HLD Companies' argument that their

manufacturing operations go beyond assembly or completion processes,

Commerce considered the nature of the production process as part of its

determination that the process of assembly or completion is minor or

insignificant.  IDM at 12-13, Appx01013-01014.  Commerce explained

that the production of welded OCTG in Brunei or the Philippines using

hot-rolled steel inputs from China is far less intensive than it would be

to produce OCTG without Chinese components. *Id.* Specifically,

Commerce considered the production of hot-rolled steel in a fully

integrated steel mill, where "iron ore goes through the sintering

process, coal goes through coke ovens, and these items are combined in

a blast furnace, moved through a hot-metal torpedo car, converter, and

concaster to become a slab." *Id.* at 12, Appx01013. A slab, in turn,

goes through the following processes:

- Reheating in a furnace at a rolling temperature of about 1,250 degrees Celsius.

- Descaling in a rough rolling mill where the slab thickness decreases from 220 mm to 30 mm, the slab length increases from 11 meters to a coil with 80 meters of heavy plate, and the plate is cleaned to remove millscale in several stages during hot-rolling.

- Finish rolling mill where the plate becomes a sheet with decreased thickness to between 1.8 mm and 16 mm and the length increased to up to 1,300 meters.

- Laminar Cooling.

- Coiling.

*Id.* at 12-13, Appx01013-01014. Commerce compared this process with

the production process of welded OCTG, explaining "that hot-rolled

steel goes through various phases, including slitting, welding, and

threading and coupling." *Id.* at 13, Appx01014.  Specifically, Commerce

stated,

> In the slitting phase, hot-rolled steel is vertically
> slit into narrower widths according to the outside
> diameter of the welded pipes to be produced.  In
> the welding phase, the hot-rolled steel goes
> through edge welding, loop storage, forming,
> welding, heat treatment, air cooling, water cooling,
> sizing, strengthening, flying saw cut, initial
> quality testing, beveling (if needed), hydraulic
> pressure test, ultrasonic wave inspection, and
> upgrading steel grade (if needed).  Then the OCTG
> is threaded and coupled, if necessary.

*Id.*  In comparing the production processes, Commerce explained that

the production of hot-rolled steel "involves multiple high-intensity steps

to turn raw materials into processed products."  *Id.*  Welded OCTG, by

contrast, "mostly consists of slitting, welding, forming, heat treatment,

cooling, and quality control without drastic changes to the length and

width, and no changes to the thickness, of the product as in the

production of hot-rolled steel."  *Id.*  Based on this analysis, Commerce

reasonably concluded that "the nature of the production process in

Brunei or the Philippines is far less intensive than it would be to

produce OCTG without Chinese components (*i.e.*, to produce the steel

and then use it in the production of OCTG)." *Id.* Commerce's

consideration of not just the number of steps involved in the production

processes, but also the nature and intensity of those steps is also

consistent with prior circumvention determinations. *See, e.g.*, *Diamond*

*Sawblades and Parts Thereof From the People's Republic of China*, 84

Fed. Reg. 33,920 (Dep't Commerce July 16, 2019) (final determ. of anti-

circumvention inquiry), and accompanying Issues and Decision

Memorandum at 9 (*DSBs from China*) ("We did not focus merely on the

number of production steps taking place in Thailand versus China, but

also examined the nature of the production steps based on the

information on the record.").

   Moreover, the nature of the production process is just one of the

factors Commerce is directed to consider in determining whether the

process of assembly or completion is minor or insignificant. *See* 19

U.S.C. § 1677j(b)(2). As explained above, Commerce found that the

other factors also suggested that the process of assembly or completion

in Brunei or the Philippines is minor or insignificant.

   The HLD Companies further argue that Commerce's analysis of

the production process is inconsistent with its findings in *Bell Supply*

*Co., LLC v. United States*, where Commerce determined "that the major physical and chemical properties of both finished and unfinished OCTG are imparted during the steel forming process, that the essential component of the merchandise is the green tube produced in {China}, and that it is the physical and chemical characteristics of green tube that determine the products ultimate use as OCTG." *See* HLD Br. at 51-52 (citing *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1244 (Ct. Int'l Trade 2019) (*Bell Supply VI*)). However, *Bell Supply VI* is distinguishable because that case involved a *substantial transformation* analysis for *seamless* OCTG, while this is a *circumvention* determination concerning only *welded* OCTG.

First, welded OCTG has a different production process than seamless OCTG. *See* ITC Report at I-14 ("OCTG mills manufacture casing and tubing either by the seamless process or by the electric resistance-welding ('ERW') process, a lower cost method than the seamless process, depending on service requirements."), Appx03854. In particular, the input for welded OCTG "is steel sheet in coil form," while the input for seamless OCTG "is a round or square steel billet." *Id.* at I-14 - I-15, Appx03854-03855. Therefore, the comparative analysis

concerning the production process is not the same for welded OCTG as it would be for seamless OCTG.

Second, and more importantly, Commerce's substantial transformation analysis is distinct from a circumvention inquiry and serves a different analytical purpose. In *Bell Supply VI*, Commerce used the substantial transformation test in the context of a scope determination to determine whether unfinished seamless OCTG (known as "green tubes") from China were substantially transformed by the heat treatment process in a third country such that the country of origin had changed. *Bell Supply VI*, 393 F. Supp. 3d at 1237. Here, by contrast, Commerce is not seeking to determine whether the Chinese hot-rolled steel inputs are substantially transformed such that the country of origin has changed; rather, Commerce is analyzing whether circumvention has occurred pursuant to the factors provided in 19 U.S.C. §1677j(b). In its opinion preceding *Bell Supply VI*, the Court of Appeals for the Federal Circuit recognized that, "even if a product assumes a new identity" through substantial transformation, "the process of 'assembly or completion' may still be minor or insignificant, and undertaken for the purpose of evading an AD or CVD order." *Bell*

*Supply Co. LLC v. United States*, 888 F.3d 1222, 1230 (Fed. Cir. 2018); *see also DSBs from China* at 10 (explaining the "distinct purposes of the two analyses and the separate factors considered"). Thus, whether or not OCTG is a separate product from the hot-rolled steel used to produce it, such that there has been a substantial transformation, is not dispositive as to a circumvention finding.

Finally, the HLD Companies argue that because the Court in *Peer Bearing* did not permit Commerce to expand the scope of an antidumping duty or countervailing duty order, that Commerce's finding here exceeds its authority. *See* HLD Br. at 53-54. However, the HLD Companies' reliance on *Peer Bearing* is misplaced. *Peer Bearing*, like *Bell Supply VI*, concerned a substantial transformation test that Commerce used in making a country-of-origin determination. Therefore, although the HLD Companies rely on what this Court "concluded" in *Peer Bearing* concerning a potential circumvention analysis, they fail to acknowledge that the Court's statements regarding circumvention in *Peer Bearing* are *entirely hypothetical*—Commerce did not conduct a circumvention analysis in that case. *See Peer Bearing Co.-Changshan v. United States*, 986 F. Supp. 2d 1389, 1403-05 (Ct.

Int'l Trade 2014).  This Court even clarified in a subsequent opinion
that its findings were based on the record of that individual case,
stating, "in the absence of {a circumvention} analysis Commerce must
interpret scope language reasonably and may not expand it.  The court
held that on the record *of this individual case*, the evidence of record
was not sufficient to support the determination that the TRBs in
question are within the scope when the scope language is reasonably,
and not expansively, interpreted."  *Peer Bearing Co.-Changshan v.
United States*, 128 F. Supp. 3d 1304, 1315 (Ct. Int'l Trade 2015)
(emphasis added).  Here, by contrast, Commerce *did* conduct a
circumvention analysis and is therefore permitted by the circumvention
statute to include the circumventing merchandise within the scope.

In sum, the statute provides that Commerce shall consider five
sub-factors under 19 U.S.C. § 1677j(b)(2) when determining whether the
process of assembly or completion is "minor or insignificant" under 19
U.S.C. § 1677j(b)(1)(C).  Commerce considered all five of these
subfactors in its review of OCTG production in this case, and
reasonably determined that the process of assembly or completion of
OCTG in Brunei or the Philippines is minor or insignificant.

## IV.   Commerce Reasonably Determined That Action Is Appropriate To Prevent Evasion Of The Orders, Pursuant To 19 U.S.C. § 1677j(b)(1)(E)

Plaintiffs argue that Commerce did not properly consider whether it was appropriate in this case to find circumvention, pursuant to 19 U.S.C. § 1677j(b)(1)(E). *See* HLD Br. at 54-60.  According to plaintiffs, a finding of circumvention is not appropriate because imports of welded OCTG from Brunei and the Philippines are "negligible" and "miniscule", HLD Br. at 55, 58, and because "little or no interest in protecting U.S. interests or the U.S. OCTG industry is apparent."  HLD Br. at 58.  As explained below, Commerce properly rejected plaintiffs' invitation to consider extra-statutory requirements in determining whether the circumvention determinations are appropriate under the statute.

As noted above, the statute provides certain "factors to consider . . . {i}n determining whether to include merchandise assembled or completed in a foreign country in a countervailing duty order or an antidumping duty order or finding under {19 U.S.C. § 1677j(b)(1)}."  19 U.S.C § 1677j(b)(3).  Specifically, the statute provides that Commerce shall take into account such factors as the pattern of trade, whether the manufacturer or exporter of the inputs is affiliated

40

with the person who uses the inputs to produce the merchandise in the foreign country, and whether imports of the inputs into the foreign country have increased since the initiation of the investigation that resulted in the antidumping or countervailing duty orders. *Id.* Here, Commerce considered all three factors and reasonably determined that action is appropriate to prevent evasion of the *Orders*.

First, Commerce found that imports of hot-rolled steel from China into both Brunei and the Philippines increased at the same time that imports of welded OCTG from Brunei and the Philippines into the United States increased. PDM at 14-15, Appx01038-01039. Second, Commerce found that both HLDS(B) and HLD Clark are affiliated with Chinese OCTG producers. *Id.* at 15, Appx01039. Finally, Commerce again considered the pattern of trade data demonstrating that, from the period 2014-2016 to the period 2017-2019, imports of hot-rolled steel from China into Brunei and the Philippines increased by 5,145.6 percent and 170.6 percent, respectively. *Id.* Considering these factors, in addition to all the other statutorily required findings, Commerce preliminarily determined that action is appropriate to prevent evasion of the antidumping and countervailing duty orders. In the final

determination, Commerce reiterated its finding that "affirmative determinations of circumvention are appropriate." IDM at 15, Appx01016.

Rather than discuss these statutory factors, plaintiffs argue that a finding of circumvention is not appropriate because imports from Brunei and the Philippines account for a relatively small percentage of total OCTG imports and the U.S. producers' market share is currently over 50 percent. HLD Br. at 55. As Commerce explained, however, the statute does not direct Commerce to consider market share in determining whether action is appropriate. *See* IDM at 15, Appx01016.

Similarly, the HLD Companies state that "the participation of the domestic industry in this inquiry has been tepid at best." HLD Br. at 56. As Commerce explained, however, "the statute gives Commerce the authority to self-initiate when warranted, and does not require the participation of the domestic industry to proceed with the circumvention inquiry." IDM at 15, Appx01016. Moreover, "U.S. domestic producers of OCTG actively participated in these circumvention inquiries by entering their appearances, providing surrogate country and value information, filing a rebuttal brief

requesting that {Commerce} continue with the affirmative determinations . . . and attending the public hearing where they presented their rebuttal arguments." *Id.* Therefore, even if Commerce were to consider participation of domestic producers, the record demonstrates that they were active throughout the proceedings.

The HLD Companies also argue that Commerce failed to explain why it self-initiated the circumvention inquiry. HLD Br. at 55-56. Specifically, they argue that Commerce's self-initiation of a circumvention inquiry should be an "exception" to the norm because of "unusual facts." *Id.* at 57-58. Unlike the self-initiation of antidumping duty or countervailing duty investigations, however, Commerce has never stated—and the circumvention statute does not require—that self-initiation of circumvention inquiries should be an exception to the norm. IDM at 16, Appx01017. Similarly, the HLD Companies state that the "HLD Companies' exports of OCTG to the United States are too insignificant to injure the U.S. domestic industry." HLD Br. at 60. Commerce again explained that the circumvention statute does not require that the ITC make an injury determination in connection with a circumvention inquiry. IDM at 16, Appx01017.

43

In sum, Commerce considered whether action is appropriate by analyzing the factors provided by the statute and was not required to take into account any of the extra-statutory considerations raised by the HLD Companies.  Thus, Commerce's analysis and final determinations are supported by substantial evidence and in accordance with law.

## **CONCLUSION**.

For these reasons, defendant respectfully requests that the Court deny plaintiffs' motion for judgment on the agency record and sustain Commerce's final determinations of circumvention in their entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy
Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:   /s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:            /s/ Hardeep K. Josan
PAUL K. KEITH          HARDEEP K. JOSAN
Senior Attorney        Trial Attorney
Office of the Chief Counsel    U.S. Dept. of Justice
for Trade Enforcement  Civil Division
and Compliance         Commercial Litigation
U.S. Department of Commerce    Branch
                       26 Federal Plaza, Rm. 346
                       New York, New York 10278
                       Tel. No. 212-264-9230 or 9245

August 5, 2022         *Attorneys for Defendant*

45

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 7,894 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Hardeep K. Josan</u>