# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| HLDS (B) STEEL SDN BHD AND | ) | |
| HLD CLARK STEEL PIPE CO., INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Ct. No. 21-00638 |
| | ) | |
| UNITED STATES | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| WELDED TUBE USA, INC., | ) | |
| WHEATLAND TUBE COMPANY, | ) | |
| AND VALLOUREC STAR L.P., | ) | |
| | ) | |
| Defendant-Intervenors | ) | |

_____

### PLAINTIFFS' HLDS (B) STEEL SDN BHD AND
### HLD CLARK STEEL PIPE CO., INC. REPLY BRIEF

Gregory S. Menegaz
Alexandra H. Salzman
Vivien J. Wang
DEKIEFFER & HORGAN, PLLC
Suite 410
1090 Vermont Ave, N.W.
Washington, D.C. 20005
*Counsel to HLDS (B) Steel Sdn
Bhd and HLD Clark Steel Pipe Co.,
Inc.*

Dated: September 26, 2022

## TABLE OF CONTENTS

I.    Introduction ................................................................1

II.   Commerce's Comparison of the HLD Companies'
      Production of OCTG to the Production of Hot-Rolled
      Steel by Integrated Steel Mills is Not Reasonable and
      Not Supported by Substantial Evidence.....................................3

III.  Commerce's Determination that the HLD Companies'
      Manufacture of OCTG was Merely an Assembly or
      Completion Operation was Unreasonable and
      Unsubstantiated by Record Evidence. ....................................23

IV.   Commerce's Finding of Circumvention in This Case was
      Not Appropriate. .......................................................29

V.    Conclusion ...............................................................33

# TABLE OF AUTHORITIES

## CASES

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (2006)...............27

*Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ....................................................................................28

*Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197 (1938)........................................................................................................7

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 537 (2009) ...........................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...............................................................................25, 27

*Peer Bearing Co.-Changshan v. United States*, 986 F. Supp. 2d 1389 (Ct. Int'l Trade 2014) ....................................................................28

## STATUTES

19 U.S.C. §1677j(b) ...........................................2, 9, 20, 23, 24, 30, 31, 33

## RULES & REGULATIONS

19 CFR § 351.225(h) ...................................................................................2

## ADMINISTRATIVE DECISIONS

*Brass Sheet and Strip from Canada; Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 Fed. Reg. 33,610 (Dep't Commerce June 18, 1993).................................21

*Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 Fed. Reg. 23,895 (Dep't Commerce, May 23, 2018) ............... 6

*Certain Corrosion-Resistant Steel Products from Taiwan: Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 Fed. Reg. 70,937 (Dep't Commerce, Dec. 26, 2019) ............................................................................................... 6

*Certain Internal-Combustion, Industrial Forklift Trucks from Japan; Preliminary Determination of Circumvention of Antidumping Duty Order, 54 Fed. Reg. 50260,* 54 Fed. Reg. 50260 (December 5, 1989) ...................................................................................... 9

*Certain Internal-Combustion, Industrial Forklift Trucks from Japan; Negative Final Determination of Circumvention of Antidumping Duty Order*, 55 Fed. Reg. 6028 (Dep't Commerce February 21, 1990) .................................................................................. 9

*Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Affirmative and Countervailing Duty Order,* 75 Fed. Reg. 3203 (Dep't Commerce, Jan. 20, 2010) ................................ 2

*Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order,* 75 Fed. Reg. 28,551 (Dep't Commerce, May 21, 2010) .................................................................... 1-2

*Certain Oil Country Tubular Goods from China*, Inv. No. 701-TA-463, USITC Publ. 4124 (January 2010) .......................... 16, 19, 21, 26, 29

*Certain Welded Carbon Steel Standard Pipes and Tubes From India: Preliminary Negative Determinations of Circumvention of the Antidumping Order,* 87 Fed. Reg. 52,507 (Dep't Commerce, August 26, 2022) .................................................................................. 13-14

*Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom Steel; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 Fed. Reg. 40336 (Dep't Commerce July 26, 1999) ........................................................................ 6, 9, 20, 21

*Hot-Rolled Steel Products from China, India, Indonesia, Taiwan, Thailand, and Ukraine*, Inv. Nos. 701-TA-405, 406, and 408 & 731-TA-899-901 and 906-908 (Second Review), USITC Publ. 4445 (Jan. 2014) ............................................................................... 12, 29

*Oil Country Tubular Goods From the People's Republic of China: Preliminary Affirmative Determinations of Circumvention*, 86 Fed. Reg. 43,627 (Dep't Commerce, August 10, 2021) .................................... 12

*Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Determinations of Circumvention,* 86 Fed. Reg. 67,443 (Dep't Commerce, Nov. 26, 2021) ................................................... 2,

*Polyethylene Retail Carrier Bags from Indonesia, Taiwan, and Vietnam*, Inv. Nos. 701-TA-462 and 731-TA-1156-1158 (Preliminary), USITC Publ. 4080 (May 2009) ......................................... 17

*Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 Fed. Reg. 31,302 (June 2, 2014) ..................................... 15

*Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 Fed. Reg. 61,056 (October 9, 2014) ............................................... 15, 20

*Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination,* 77 Fed. Reg. 33405 (June 6, 2012) ........................... 15, 20

*Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 47,596 (August 9, 2012) .......... 15

*Small Diameter Graphite Electrodes from China*, Inv. No. 731-TA-1143 (Second Review), USITC Publ. 5035 (March 2020) ....................... 17


**OTHER**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), U.S.C.C.A.N. 4040 ......................................................................................... 26

# GLOSSARY OF TERMS

| | |
|---|---|
| AD | Antidumping Duty |
| CORES | Corrosion-Resistant Steel |
| CVD | Countervailing Duty |
| ERW | Electric Resistance Welding |
| HLD Clark | HLD Clark Steel Pipe Co., Inc. |
| HLDSB | HLDS (B) Steel Sdn Bhd |
| HRLBC Steel | Hot-Rolled Lead and Bismuth Carbon Steel |
| HRS | Hot-Rolled Steel |
| IDM | (Final) Issues and Decision Memo |
| ITC | U.S. International Trade Commission |
| OCTG | Oil Country Tubular Goods |
| PRCB | Polyethylene Retail Carrier Bags |
| SAA | Statement of Administrative Action |
| SDGE | Small Diameter Graphite Electrodes |

## I.   Introduction

Plaintiffs HLDS (B) Steel Sdn Bhd ("HLDSB") and HLD Clark Steel Pipe Co., Inc. ("HLD Clark") (together: "HLD Companies") hereby reply to the response briefs of Defendant United States ("Defendant" or "United States") and Defendant-Intervenors, Welded Tube USA, Inc., Wheatland Tube Company, and Vallourec Star, L.P. *See* Defendant's Response to Plaintiffs' Motion for Judgment on the Agency Record (August 5, 2022) ("U.S. Rsp. Br."), ECF Doc. No. 34, and Defendant-Intervenors' Response Brief in Opposition to the Motion for Judgment on the Agency Record (August 19, 2022) (Def.-Intv. Rsp. Br."), ECF Doc. No. 35.

HLDSB is a Bruneian producer of oil country tubular goods, or "OCTG," and HLD Clark is a Philippine producer of OCTG.  The circumvention inquiry conducted by the U.S. Department of Commerce ("Commerce") concerned whether the HLD Companies' OCTG manufactured in Brunei and the Philippines using hot-rolled steel manufactured in China circumvented the antidumping and countervailing duty orders on OCTG from China.  *See Certain Oil Country Tubular Goods From the People's Republic of China,* 75 Fed.

Reg. 28,551 (Dep't Commerce May 21, 2010) (final AD determination and AD Order) and *Certain Oil Country Tubular Goods from the People's Republic of China,* 75 Fed. Reg. 3203 (Dep't Commerce Jan. 20, 2010) (final CVD determination and CVD Order) (the "Orders"). Commerce conducted the underlying circumvention inquiry pursuant to 19 U.S.C. § 1677j(b) and 19 CFR § 351.225(h), "merchandise completed or assembled in other foreign countries." *See Oil Country Tubular Goods From the People's Republic of China,* 86 Fed. Reg. 67,443 (Dep't Commerce, Nov. 26, 2021) (final circumvention determination) ("Final Circ. Det."), **Appx01000**, and accompanying Issues and Decision Memorandum at 1 ("Final IDM"), **Appx01002**. The merchandise at issue is welded OCTG.

The HLD Companies challenge Commerce's finding that their OCTG manufactured in Brunei and the Philippines is circumventing the Orders on OCTG from China. The HLD Companies therefore ask this Court to remand Commerce's final determination with instructions to find, based on record evidence, that the HLD Companies' production of OCTG in Brunei and the Philippines does not meet the criteria of 19

2

U.S.C. § 1677j(b) and 19 CFR § 351.225(h) for merchandise that is only "completed or assembled" in a third country.

## II.   Commerce's Comparison of the HLD Companies' Production of OCTG to the Production of Hot-Rolled Steel by Integrated Steel Mills is Not Reasonable and Not Supported by Substantial Evidence.

As Plaintiffs argued in their moving brief, Commerce's comparison of an integrated steel mill's manufacture of primary forms of steel with the HLD Companies' manufacture of OCTG was unreasonable because the manufacturing processes of the two industries are too different to compare in a meaningful way.  *See* Plaintiffs' Rule 56.2 Memorandum in Support of Motion for Judgment upon the Agency Record (June 6, 2022) at 15-39 ("HLD Moving Br."), EFC Doc. No. 33-1.

Defendant claims that Commerce's comparison is reasonable because welded OCTG is produced from hot-rolled steel ("HRS") and hot-rolled steel production is capital intensive.  U.S. Rsp. Br. at 17. Defendant then states that these facts are relevant to whether a producer would reasonably move its further processing across borders to avoid an order.  Yet no evidence on the record of this case, and Defendant has no cited to any evidence, indicates that a Chinese HRS

producer moved **its** further processing across borders. *Id*. No HLD affiliate is a Chinese integrated steel mill producing HRS, and neither of the HLD companies purchased HRS from affiliates seeking to move finishing operations across borders. Rather, the HLD Companies' Chinese affiliates produce OCTG (referred to herein as Company A and Company B) and, like HLD Clark and HLDSB, purchase HRS as an input for their pipe production. *See* Clark Questionnaire Response (March 16, 2021) ("HLD Clark Qre Rsp.") at 1-2, 5-11, 28-29 & Ex. 1.1; **Appx02209-02210, Appx02213-02219, Appx02236-02237 & Appx02244-02247.** HLDSB Questionnaire Response (March 16, 2021) ("HLDS Qre Rsp.") at 1-2, 4-11, 28-29 & Ex. 1.1, **Appx01554-01555, App01557-01564, Appx01581-01582 & Appx01589-01594.**

In its defense of Commerce's comparison methodology, Defendant fails to respond to Plaintiffs' arguments that the items to be compared must be similar enough in relevant ways to merit comparison. *See* HLD Moving Br. at 15-17; *compare* U.S. Rsp. Br. at 18-27. The HLD Companies argue that the only reasonable and proper methodology to measure the extent of their operations is to compare the HLD

Companies' investments, facilities, and production processes to those of Chinese and U.S. OCTG producers. HLD Moving Br. at 23-24, 40-43. It is not reasonable to compare OCTG production with an integrated steel mill's production because integrated steel mills serve a multitude of downstream industries and manufacturing segments. *Id.* at 19-23. In so doing, Commerce has reversed its long-standing practice to keep its comparisons within the discrete recognized segments of the steelmaking industry.

For instance, Commerce's circumvention inquiry in *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom* ("*HRLBC Steel*") concerned whether imports into the United States of leaded steel billets exported from Germany and the United Kingdom constituted circumvention of the antidumping and countervailing duty orders of *HRLBC Steel from Germany and the United Kingdom*. In its negative determination on circumvention, Commerce stated:

> {A} comparison of operations undertaken and the investment
> needed by an integrated mill would not represent an
> appropriate standard in this case and would fail to provide
> an accurate representation of the U.S. re-rollers' level of

5

investment. The petitioners' assertion that the U.S. re-rollers' investment in rolling mills is small compared to its integrated mills' investment in the United States is irrelevant because, here, we are only concerned with the investment required at a rolling mill, a separate, recognized segment of the steelmaking industry as identified by the ITC.

This case does not involve a new and different type of processor. The U.S. lead bar industry is comprised of both integrated producers and re-rollers. This composition of the U.S. lead bar industry existed before the initiation of the original AD and CVD investigations of lead bar from Germany and the United Kingdom. Because re-rollers are a separate, recognized part of the U.S. lead bar industry, there is no need to compare their investments and facilities to another segment of the U.S. steel industry.

*Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom Steel*, 64 Fed. Reg. 40336, 40345, 40346 (Dep't Commerce July 26, 1999) (negative determination of circumvention). The HLD Companies' case is even more compelling than *HRLBC Steel*, because the U.S. OCTG manufacturing industry is composed of only OCTG manufacturers that do not produce their own HRS.

Instead of responding to Plaintiffs' arguments, Defendant first points out the principle that "Commerce's choice of methodology warrants 'tremendous deference.'" U.S. Rsp. Br. at 19. Defendant does not respond to Plaintiffs' argument, however, that Commerce abused its

6

discretion.  HLD Moving Br. at 35-39.  Furthermore, beginning with the

CORES cases that Defendant cites,[1] Commerce changed its long-

standing practice and policy without ever justifying its reversal.  U.S.

Rsp. Br. at 19-20.  A fundamental legal principle requires agencies to

explain its changes in policy.

> Where there is a policy change the record may be much more
> developed because the agency based its prior policy on
> factual findings. In that instance, an agency's decision to
> change course may be arbitrary and capricious if the agency
> ignores or countermands its earlier factual findings without
> reasoned explanation for doing so. An agency cannot simply
> disregard contrary or inconvenient factual determinations
> that it made in the past, any more than it can ignore
> inconvenient facts when it writes on a blank slate.

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 537 (2009).  *See also Consol.*

*Bearings Co. v. United States,* 348 F.3d 997, 1007 (Fed. Cir. 2003) (If

the Department provides "no reasonable explanation" for changing a

practice that it has "consistently followed," such a change is an

unacceptable agency practice.).

Without Commerce's explanation of why it changed its practice of

---

[1] *Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 83
Fed. Reg. 23,895 (Dep't Commerce May 23, 2018) (affirm. final determ. of
circumvention); *Certain Corrosion Resistant Steel Products from Taiwan*, 84 Fed.
Reg. 70,937 (Dep't Commerce Dec. 26, 2019) (affirm. final determ. of circumvention).

almost 20 years of comparing levels of investment, production facilities, and production processes *within* separate, recognized segments of the incredibly diverse steel industry, here – within the OCTG manufacturing industry, the Court cannot judge whether Commerce's changed practice is reasonable according to Commerce's understanding of the statutory dictates of U.S. circumvention law. For instance, if Commerce changed its prior practice in circumvention cases in order to regulate trade between two foreign countries, this would be a purpose not covered by U.S. circumvention law. It would also be difficult find support in U.S. circumvention law if Commerce's reason for initiating a circumvention proceeding is to impose AD/CVD duties on recognized, long-established industries in third countries without proper AD/CVD and injury investigations.

Second, some of Defendant's responses regarding the reasonableness of Commerce's comparison methodology simply do not make sense or are inconsistent with other responses. For instance, regarding Commerce's attempted rationalization that its methodology is "relevant to whether a producer would reasonably move its further

processing across borders *to avoid an order,*" Defendant maintains that the argument does not draw conclusions as to intent or motive.  U.S. Br. at 20-21.  Plaintiffs believe, however, that "to avoid an order" means "to avoid an order" and speaks to intent.  *See* HLD Moving Br. at 17-18. Moreover, the Chinese HRS producers that supply HLD Companies' HRS input are all unaffiliated and did not move any of their further manufacturing across borders.

Defendant is also wrong when it maintains that "the statute does not provide guidance for what levels of activities . . . would constitute minor or insignificant processing . . ...."  U.S. Br. at 21.  To the contrary, 19 U.S.C. § 1677j(b) expressly regulates "{m}erchandise *completed or assembled* in a third country."  Thus the criteria are applied specifically to the activities of completion and assembly.  HLD Moving Br. at 39-54. In *HRLBC Steel*, Commerce reiterated a principal finding in an earlier circumvention case that "the foreign respondents 'made substantial investment in plant and equipment' and that the 'level of production operations is too great to characterize these operations as completion or assembly operations established for the purpose of evading the

antidumping duty order.'"  *HRLBC Steel*, 65 Fed. Reg. at 40345, citing

*Certain Internal-Combustion, Industrial Forklift Trucks from Japan,* 54

Fed. Reg. 50260, 50263 (December 5, 1989) (preliminary determination

of circumvention) and *Certain Internal-Combustion, Industrial Forklift*

*Trucks from Japan*, 55 Fed. Reg. 6028 (Dep't Commerce February 21,

1990) (negative final determination of circumvention).  As discussed in

their moving brief, the HLD Companies investments, production

facilities, and production processes are fully comparable to those of their

Chinese counterparts whose information is on the record of this case.

Moreover, the HLD Companies perform all of the manufacturing

processes, from start to finish, that are performed and reported by the

U.S. OCTG industry and reported by the U.S. International Trade

Commission ("ITC").  HLD Moving Br. at 23-24, 43.

Third, Defendant next argues that because the HLD companies

can manufacture other pipe not intended or certified for use as oil

country tubular goods at their manufacturing facilities, it would not be

a reliable basis to segregate the amount of the investment, proportion of

production, and extent of production facilities of a specific HRS

producer to supply the steel input to a typical OCTG producer.  U.S. Br. at 23, citing to Final IDM at 8, **Appx01009**.  Indeed, not only the HLD Companies, but also their Chinese OCTG producing counterparts manufacture other welded pipes and tubes at their plants.  *See* HLDSB, Supplemental Questionnaire Response (June 17, 2021) at 2-4, **Appx03616-03618**; HLD Clark, Supplemental Questionnaire Response (June 17, 2021) at 2-5, **Appx03343-03346**.  Thus, Defendant must agree, according to its own logic, that the comparison of the HLD Companies' investments, production facilities, and production processes with Chinese producers of OCTG must be reliable.  In contrast, if the fact that the HLD Companies produce other welded pipe at their facilities is a reason to reject as unreliable a comparison with only that portion of an integrated mill's investments, production facilities, and production processes dedicated to supplying a specific OCTG producer, Commerce's methodology of comparing the total investment, facilities, and production process of a conglomerate of integrated steel mills must be colossally unreliable.

As Plaintiffs argued in their moving brief, the vast majority of the

investments and production facilities of the integrated steel mills that
Commerce uses as a comparison group have nothing to do with the
production of OCTG.  Thus, Commerce's reasoning that integrated steel
mills provide "an absolute level of investment" and "context" for the
production of OCTG is too wide of the mark to be a reasonable
argument that integrated mills are relevant as a base comparison
group.  *See* Final IDM at 6, 7, 8, **Appx01007, Appx01008, Appx01009**.
Hot-rolled steel has a great array of uses and applications, and
integrated mills typically serve numerous industry sectors.  Examples
of industries that use HRS as an input are the automotive sector, auto
parts, appliances, transportation infrastructure, and construction
industries, either directly or as downstream derivatives.  Along with the
energy tubular products, which includes OCTG, the ITC reports the
following examples of HRS end uses: "agricultural equipment, beam
assemblies, brake components, boilers, bumpers, conduit, cranes,
dishwashers, electrical housings, guard rails, hollow structural shapes,
hydraulic tanks, industrial machinery, lawn mower decks, pilings,
platforms, refrigerators, shelving racks, shipbuilding machinery, steel
grating, tin mill products, torque converter covers, and washing

12

machines." *See Hot-Rolled Steel Products from China, India, Indonesia, Taiwan, Thailand, and Ukraine*, Inv. Nos. 701-TA-405, 406, and 408 & 731-TA-899-901 and 906-908 (Second Review), USITC Publ. 4445 (Jan. 2014) at II-10.

The extensive and diverse range of steel articles for which HRS is the primary input also calls into question Commerce's conclusions on patterns of trade and increase of HRS shipped from China to Brunei and the Philippines. *See Oil Country Tubular Goods from the People's Republic of China*, 86 Fed. Reg. 43,627 (Dep't Commerce Aug. 10 2021) (preliminary determination of circumvention) and accompanying Decision Memorandum at 14-16 ("Prelim Dec. Memo"), **Appx01038-01040**. Commerce found that from the three-year period 2016-2016 to the period 2017-2019 imports of HRS from China into Brunei increased by 5145.6 percent and imports of HRS from China into the Philippines increased by 170.6 percent. *See also* U.S. Rsp. Br. at 41. The record of this case gives no indication that any integrated steel mill producing HRS exists in the Philippines or Brunei (and there is none). Since HRS is used in the construction and automotive industries, for household

13

goods, and industrial machinery of all kinds, any increase in

manufacturing and construction in the Philippines and Brunei requires

the importation of HRS.  Insofar, Commerce's conclusions in its recent

negative preliminary determination in its circumvention inquiry of

*Welded Carbon Steel Standard Pipes and Tubes from India* applies

equally to this instant case of OCTG from China.  Commerce found:

> The record does not indicate a clear connection between the
> increase in shipments of Indian HRS to Oman and the UAE
> and circumvention of the Indian *Order* because global Indian
> HRS exports increased substantially during the same period,
> the Oman and UAE respondents used an overwhelming
> amount of Indian HRS for steel products sold in their
> domestic and third country markets, and HRS is not limited
> to the production of pipe and tube, but also consumed for the
> production of multiple downstream steel products.

> As noted above, all four respondents do not produce HRS
> and there is no production of HRS in Oman and the UAE;
> therefore, large imports of HRS from India (*i.e.*, the second
> largest HRS exporter after the People's Republic of China) is
> not unusual and does not, by itself, indicate circumvention in
> this case.[163] An overwhelming amount of Indian HRS is used
> for merchandise in relation to downstream steel production
> in the domestic and regional markets because these
> countries do not produce HRS.

*Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 87

Fed. Reg. 52,507 (Dep't Commerce Aug. 26, 2022) (preliminary negative

circumvention determination) and accompanying Preliminary Decision

Memorandum at 23-24.  Accordingly, the fact that HRS is used as an input in a multitude of downstream industries invalidates not only Commerce's comparison methodology but also Commerce's analysis of patterns of trade.

Finally, in its discussion of Commerce's comparison methodology, Defendant relies on Commerce's decisions in *Small Diameter Graphite Electrodes from China* ("*SDGE*") and *Polyethylene Retail Carrier Bags from Taiwan* for the proposition that ("*PRCBs*") for the proposition that Commerce compares the total investment required from the beginning of the production process in the country subject to an AD/CVD order to the investment required to finish the final product in the third country rather than to compare the investments for just the finishing steps in each country.  U.S. Br. at 23-27.  *See Small Diameter Graphite Electrodes from the People's Republic of China*, 77 Fed. Reg. 33,405 (Dep't Commerce June 6, 2012) (preliminary circumvention determination) ("*SDGE China Prelim*"), unchanged in *Small Diameter Graphite Electrodes from the People's Republic of China,* 77 Fed. Reg. 47,596 (Dep't Commerce August 9, 2012) (final circumvention determination) (*SDGE China Final*) and *Polyethylene Retail Carrier*

15

*Bags from Taiwan*, 79 Fed. Reg. 31302 (Dep't Commerce June 2, 2014)

(preliminary circumvention determination) (*PRCBs Taiwan Prelim*),

and accompanying PDM, unchanged in *Polyethylene Retail Carrier*

*Bags from Taiwan*, 79 Fed. Reg. 61,056 (Dep't Commerce October 9,

2014) (final circumvention determination) (*PRCBs Taiwan Final*).

Defendant-Intervenors accuse the HLD Companies of arguing that "any

steel product that may be circumventing an existing order should be

free of scrutiny" and that they ignore the comparative aspect of

Commerce's methodology.  Def.-Intv. Rsp. Br. at 9, 10.

Defendant and Defendant-Intervenors misrepresent the HLD

Companies' position.  The HLD Companies do not advocate that

Commerce compare only the finishing steps of a production cycle with

the same finishing steps of another processor in their own country or a

third country.  For example, if the HLD Companies imported tubes into

the Philippines or Brunei, and the only operation that HLDSB or HLD

Clark performed on the tubes was to thread and attach coupling to the

ends of the tube, the HLD Companies would fully expect Commerce to

compare this finishing operation with the full OCTG production cycle.

The HLD Companies provided the description of the full cycle of OCTG

16

production in their moving brief, based on the description that the original petitioners provided to Commerce and the U.S. International Trade Commission ("ITC") in their petition for relief.   *See* HLD Moving Br. at 40-42, quoting *Certain Oil Country Tubular Goods from the People's Republic of China*, Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Section 701 and 731 of the Tariff Act of 1930, As Amended, Vol. I (April 8, 2009) at 8-10 ("OCTG Petition"); *see also* OCTG production process with illustration in *Certain Oil Country Tubular Goods from China,* Inv. No. 701-TA-463 (Final), USITC Publ. 4124, (January 2010) at I-14 – I-20, included in Initiation Memo as Ex. 2, **Appx03854-03860**.

In their moving brief, the HLD Companies distinguish *SDGE from China* and *PRCBs from Taiwan* from this instant OCTG case because the finishing operations described in *SDGE from China* and *PRCBs from Taiwan* were factually no more than completion operations within their specific industry segments.   *See* HLD Moving Br. at 27-31. Regarding SDGEs, the ITC's investigative report shows clearly that the machining of the graphite electrode, which was the only operation performed in a third country, was the very last step in the production

17

process that consisted of forming, extrusion, baking, pitch impregnation, rebaking, graphitizing, and, finally, machining. *See Small Diameter Graphite Electrodes from China*, Inv. No. 731-TA-1143 (Second Review), USITC Publ. 5035 (March 2020) at I-23 (illustration of manufacturing process). Similarly, the PRCBs were manufactured in Taiwan but for cutting to length and sealing the bag from a continuous roll of tubular polyethylene film and die cutting handles. *See Polyethylene Retail Carrier Bags from Indonesia, Taiwan, and Vietnam*, Inv. Nos. 701-TA-462 and 731-TA-1156-1158 (Preliminary), USITC Publ. 4080 (May 2009) at I-7 for an illustration of the PRCB production process.

In their discussion on the production process of PRCBs, the HLD Companies noted that the industry, as reflected in the ITC's investigative report, does not include the production of polyethylene resin pellets, the major input for PRCBs, as a step in the specific production of PRCBs. The ITC states: {t}he process for manufacturing PRCBs is generally the same everywhere in the world. It is basically a four-step process consisting of (1) blending polyethylene resin pellets,

18

color concentrates and other additives; (2) extrusion and film forming; (3) printing; and (4) bag conversion." *Id.* at I-7. According to the facts of Commerce's PRCB inquiry, only the fourth step – bag conversion – was performed in the third country. PRCBs Taiwan Prelim Decision Memorandum at 7.

Defendant finds the HLD Companies' comparison of polyethylene resin pellets as the major input in the production of PRCBs with HRS as the major input in the production of OCTG to "miss the point." U.S. Br. at 26. In fact, not the HLD Companies, but Defendant misses the point. The comparison properly focuses on the primary input of the *inquiry merchandise* – OCTG in the instant case and PRCBs in the comparison case – not the inputs of the inputs HRS and polyethylene resin pellets. Where Defendant recommends comparing the inputs of the inputs, e.g., iron ore as an input of HRS, the parallel comparison objects are the inputs of the pellets: crude oil, natural gas, or coal followed by refining and polymerization processes.

Unlike Commerce's factual findings of the production processes in *SDGE from China* and *PRCBs from Taiwan*, the HLD Companies

perform all steps of OCTG production at their facilities in Brunei and the Philippines.  *See* HLD Moving Br. at 40-43, quoting excerpts on the OCTG production process from the original petition, OCTG Petition at 8-10; *see also* OCTG production process with illustration in *Certain Oil Country Tubular Goods from China,* Inv. No. 701-TA-463 (Final), USITC Publ. 4124, (January 2010) at I-14 – I-20, included in Initiation Memo as Ex. 2, **Appx03854-03860**.  At no point in Commerce's administrative procedure nor during this litigation has any party disputed that the HLD Companies perform all production steps in the manufacturing OCTG sector as described by the U.S. domestic OCTG industry and the ITC and as performed by the HLD Companies' U.S. and Chinese OCTG manufacturing counterparts.

Defendant also misquotes the statute by intimating that the circumvention covers "*inputs* 'produced in the foreign country with respect to which such order or finding applies.'" U.S. Rsp. Br. at 26 {emphasis added}; 19 U.S.C. § 1677j(b)(1)(B).  The statute language is "merchandise" produced in the foreign country subject to the order.  And this merchandise must be unfinished or unassembled inquiry

merchandise because it is to be completed or assembled in the third country.  In order to apply the statutory mandate, it is therefore imperative to articulate exactly what the unfinished or unassembled merchandise in the third country is.  Commerce describes the subject country merchandise in the *SDGE from China* circumvention inquiry as an "unfinished electrodes." *SDGE China Prelim*, 77 Fed. Reg. at 33,410. Commerce describes the subject country merchandise in the *PRCBs from Taiwan* circumvention inquiry as "unfinished PRCBs from Taiwan." *PRCB Taiwan Fin*al, 79 Fed. Reg. at 61,057.  Thus, in both cases, Commerce followed the circumvention statutes mandate to investigate merchandise that is "completed or assembled" in a third country.  19 U.S.C. § 1677j(b)(1)(B).

In *HRLBC Steel from Germany and the United Kingdom,* Commerce also distinguished prior circumvention determinations. *See HRLBC Steel*, 64 Fed. Reg. at 40,348-40,349.  Commerce's determination in *Brass Sheet and Strip from Canada* concerned whether a U.S. processor who re-rolled brass plate from Canada into brass sheet and strip in the United States was circumventing the AD

order on brass sheet and strip from Canada.  *Id.* at 40,348, citing to

*Brass Sheet and Strip from Canada*, 58 Fed. Reg. 33,610 (Dep't

Commerce June 18, 1993) (final circumvention determination) ("*Brass*

*Sheet and Strip*").  In that case, Commerce found that the imported

brass plate was a product that was one rolling step short of constituting

sheet and strip prior to importation.  *HRLBC Steel* at 40,348.  Further,

brass plate re-rollers were not considered a separate and recognized

segment of the brass sheet and strip industry, but rather one created by

a foreign exporter in an attempt to evade the order on brass sheet and

strip.  *Id.* at 40,349.  Therefore, Commerce distinguished *HRLBC Steel*

because the rolling mills that roll lead billets into hot-rolled bar "have

always been considered a distinct part of the industry."  *Id.* at 40,348-

40,349.

As in *HRLBC Steel*, the OCTG industry is a distinct segment of

the overall steel industry, in Brunei, in the Philippines, in China, in the

United States, and throughout the world.  *See* OCTG China Petition

and *Certain Oil Country Tubular Goods from China,* Inv. No. 701-TA-

463 (Final), USITC Publ. 4124, (January 2010).  The HLD Companies

have provided Commerce complete information for the comparison of their OCTG operations in Brunei and the Philippines with the complete operations of Chinese OCTG producers. *See, e.g.,* HLD Clark Questionnaire Response (March 16, 2021) ("HLD Clark Qre Rsp.") at 5, **Appx02213**, and Ex. 1.2 (company brochure), **Appx02248-02282**; Ex 9.1 and 9.2 (Company A & Company B lists of machinery), **Appx02412-02423**; Ex. 12 (Company A & Company B production flowcharts), **Appx02424-02428**; Ex. 25.1 (Company A & Company B business scope in business licenses), **Appx02479-02481** & **Appx02490-02491**; & Ex. 25.2 (Company A & Company B hot-rolled steel purchase documents), **Appx02540-02553**; HLD Clark Supplemental Questionnaire Response (June 17, 2021) ("HLD Clark Supp. Rsp.") at 1, **Appx03342**, and Ex. SQ1-4.1 & SQ1-4.2 (Company A & Company B lists of machinery), **Appx03365-03388**; Ex. SQ1-6.1 (Company A & Company B production flowcharts), **Appx03414-03418**. *See also* HLD Clark Preliminary Comments at 4 – 5, **Appx03765-03766**. Defendant-Intervenors were also free to provide their own investment and operational data to compare with the HLD Companies' investments and production operations.

No party to this litigation disputes the fact that the OCTG industry is a distinct segment of the overall steel industry. Accordingly, the proper comparison of the HLD Companies' investments, production facilities, and production processes is with other manufacturers of OCTG.

III. **Commerce's Determination that the HLD Companies' Manufacture of OCTG was Merely an Assembly or Completion Operation was Unreasonable and Unsubstantiated by Record Evidence.**

Defendant finds that Plaintiffs' efforts to discern the meaning of "assembly" and "completion" in the circumvention statute to be an "attempt to use semantics to insert a new requirement into the circumvention statute, *i.e.*, that the production in the foreign country must constitute assembly or completion." U.S. Rsp. Br. at 29-30. Defendant is correct that Plaintiffs' position is that the circumvention statute addresses assembly or completion of merchandise in the foreign country. This is, however, hardly a "new requirement" but rather repeats exactly the subject matter that the circumvention statute regulates, namely, "(b) Merchandise completed or assembled in other foreign countries." 19 U.S.C. § 1677j(b).

24

Defendant and Defendant-Intervenors are also correct that Plaintiffs use "semantics" to find a commonly understood meaning for the words "assembly" and "completion."  U.S. Rsp. Br. at 30; Def.-Intv. Rsp. Br. at 11 n.2.  Semantics is "a study of meaning, particularly the meaning communicated in language."  The Wolters Kluwer Bouvier Law Dictionary Desk Edition, available at advance.lexis.com (last viewed Sept. 24, 2022). [2]  Although Defendant and Defendant-Intervenors appear to refer to "semantics" in a pejorative sense, the understanding of the meaning of "completion" and "assembly" is hardly an "extra-statutory consideration" when the statute uses these words to describe the activity it is regulating.  19 U.S.C. § 1677j(b); *see* HLD Moving Brief at 39-49; *compare* U.S. Rsp. Br. at 31.

In addition, Defendant claims that the HLD Companies ignore the statutory directive in 19 U.S.C. § 1677j(b) for Commerce to consider the "nature" of the production process in the foreign country.  Defendant's

---

[2] The first full paragraph of the definition from Wolters Kluwer Bouvier Law Dictionary: "The study of the meaning, or a dismissive label for a technical argument. Semantics is a study of meaning, particularly the meaning communicated in language. It is closely related to semiotics and is usually thought of as a branch of linguistics. In this sense, semantics has much to give jurisprudence, for instance, in the study of criteria for meaning and the structure of relationships among related words."

critique is unjustified, where Defendant, for its part, ignores the actual language of the statute directing Commerce to assess whether the "*process of assembly or completion*" is minor or insignificant.  This is an important aspect of the problem that Commerce's circumvention determination fails to consider.  As the U.S. Supreme Court has found:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").  In this instant case, Commerce must first resolve the important question as to what the statute means by "assembly" and "completion" processes before it analyzes whether such activities are minor or insignificant.  *See* HLD Moving Br. at 43-45; Final IDM at 12-13, **Appx01013-01014**.

Dictionary definitions and Congress's Statement of Administrative Action referring to "screwdriver operations," ITC's investigative report, and Defendant-Intervenors' own statements as petitioners in the

administrative proceedings covering *OCTG from China* are legitimate

interpretive tools for understanding whether the HLD Companies'

manufacturing facilities and processes are completion or assembly

operations that are minor and insignificant within the recognized,

separate OCTG manufacturing industry.  *See* HLD Moving Br. at 39-46,

citing OCTG China Petition at 8-10 and Statement of Administrative

Action, Accompanying the Uruguay Round Agreements Act (URAA), H.

Doc. 103-316, vol. 1 (1994), U.S.C.C.A.N. 4040, 4216 ("SAA"); *see also*

OCTG production process with illustration in *Certain Oil Country*

*Tubular Goods from China,* Inv. No. 701-TA-463 (Final), USITC Publ.

4124, (January 2010)  at I-14 – I-20, included in Initiation Memo as Ex.

2, **Appx03854-03860**.  Further, Commerce must recognize that its

circumvention analyses in *HRLBC Steel from Germany and the UK*,

*SDGE from China*, and *PRCBs from Taiwan* focused on the specific,

recognized industry addressed by the relevant order, and not on the

production processes of an input such as HRS that can be consumed in

an almost infinite number of downstream manufacturing sectors.  Thus,

Defendant-Intervenors' concern that Commerce would have no context

or reference point for comparison without comparing the OCTG

industry to the HRS industry is without merit.  Def.-Intv. Rsp. Br. at
10.

In this instant case, Commerce has failed to consider an important
aspect of the problem of ascertaining whether the HLD Companies'
operations are assembly or completion processes in the first place.
Hereby, the administrative record of this case allows Commerce to
compare the HLD Companies' operations with those of their Chinese
and U.S. OCTG manufacturing counterparts to determine whether the
HLD Companies perform only a finishing or assembly operation within
the production steps recognized as complete OCTG production.  *See*
OCTG China Petition at 8-10, quoted in HLD Moving Br. at 40-42.

Commerce has thus failed to consider an important issue in this
case, and its circumvention determination is arbitrary and capricious
and subject to reversal.  *See Anderson v. U.S. Sec'y of Agric.*, 462 F.
Supp. 2d 1333, 1339 (Ct. Int'l Trade 2006) (internal citation omitted)
("Courts will therefore not defer to an agency regulation or adjudicative
decision when they produce results which are arbitrary, capricious, or
manifestly contrary to the statutory scheme"); *see also State Farm,* 463

28

U.S. at 43.

In addition, Defendant did not address the HLD Companies'
argument that Commerce's circumvention determination failed to
explain what changes, drastic or not, are made to HRS in the
manufacture of OCTG.  *See* Def. Rsp. Br. at 33-35; *see also* HLD Moving
Br. at 50-54 and Final IDM at 13.  In context of Commerce's factually
questionable findings of no substantial changes to the HRS input in
Plaintiffs' OCTG production, the HLD Companies found the Court's
decisions in *Bell Supply* and *Peer Bearing* cases to be helpful.  HLD
Moving Br. at 49, 51, 53-54, citing to *Bell Supply Co., LLC v. United
States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ("*Bell Supply VI*")
and *Peer Bearing Co.-Changshan v. United States*, 986 F. Supp. 2d
1389, 1403-05 (Ct. Int'l Trade 2014).  Although both cases involved
scope inquiries rather than circumvention inquiries, Commerce's and
interested parties' statements regarding the manufacturing processes in
the third country and the Court's understanding as to what type of
changes to the merchandise it considered "substantial" are useful in
addressing Commerce's conclusions, or lack thereof, regarding the

changes HRS undergoes in the OCTG manufacturing process.  *Compare* U.S. Rsp Br. at 35-39.

In conclusion, HRS is classified in the U.S. Harmonized Tariff Schedule ("HTSUS") in Ch. 72 as "iron and steel."  *See* HRS scope definition in *Hot-Rolled Steel Products from China, India, Indonesia, Taiwan, Thailand, and Ukraine*, Inv. Nos. 701-TA-405, 406, and 408 & 731-TA-899-901 and 906-908 (Second Review), USITC Publ. 4445 (Jan. 2014) at 8.  OCTG is classified in the HTSUS in Ch. 73 as an "article of steel."  *See* scope definition in *Certain Oil Country Tubular Goods from China,* Inv. No. 701-TA-463 (Final), USITC Publ. 4124, (January 2010) at I-8.  For all articles of steel described in Ch. 73 of the HTSUS, the cost of the primary forms of steel inputs will almost always be a significant proportion of the total value of the steel article. Nevertheless, this factor does not reduce the manufacture of every article of steel to a completion or assembly operation on the primary steel form.  The steel industry is composed of innumerable segments specializing in specific articles of steel.  No integrated steel mill produces all primary forms and compositions of iron and steel and no

integrated mill produces every article of iron and steel covered in Ch. 73 of the HTSUS.  Commerce's comparison model applied to the HLD Companies' OCTG manufacturing is a fiction that is illogical, arbitrary and capricious, and not supported by any substantial evidence.

## IV.   Commerce's Finding of Circumvention in This Case was Not Appropriate.

Defendant does not respond directly to the HLD Companies' arguments that Commerce did not properly consider whether finding circumvention in this case is appropriate.  *See* U.S. Rsp. Br. at 40-44; HLD Moving Br. at 54-60.  Rather, Defendant characterizes the HLD Companies' arguments that Commerce consider certain issues in its "appropriateness" analysis as "extra-statutory" requirements. According to Defendant, Commerce's analysis is limited to the factors listed in 19 U.S.C. § 1677j(b)(3)(A)-(C).  U.S. Rsp. Br. at 40-42. Defendant hereby ignores the structure of the circumvention statute: paragraph (3) refers to all of paragraph (1), not just subparagraph (E). Paragraph (3) of 19 U.S.C. § 1677j(b) provides no indication whatsoever that Commerce's considerations are limited to (A) – patterns of trade; (B) – affiliation; or (C) – increase in imports.

31

For their part, Defendant-Intervenors revert to the circular argument that if Commerce finds that a respondent is circumventing an order based on the statutory criteria, then a finding of circumvention is appropriate.  Def.-Intv. Rsp. Br. at 12-13.  Defendant-Intervenors fail to consider, however, that, as with the other criteria listed under 19 U.S.C. § 1677j(b)(1)(A) – (D), Commerce's affirmative finding of "appropriateness" is necessary for a final conclusion of circumvention. According to the structure of the statute, the status of 19 U.S.C. § 1677j(b)(1)(E) is equal to that of the preceding provisions in (A) through (D).

Moreover, Defendant's claim that the HLD Companies did not address the factors in (3)(A)-(C) is incorrect.  Regarding patterns of trade, the HLD Companies pointed out that that their imports from Brunei and the Philippines were inconsequential for the U.S. market, which combined account for less than 5% of all U.S. imports of welded pipe.  HLD Moving Br. at 55.  Commerce noted that imports from Brunei and the Philippines together increased from 2.8% to 4.9% during the period of inquiry, 2017 through November 2020.  Initiation memo at

32

9, **Appx03845**.  But, as the HLD Companies discussed in their moving brief, in terms of U.S. market share of all merchandise, both imported and domestically produced welded and seamless OCTG, the current presence of Bruneian and Philippine OCTG on the U.S. market is negligible.  HLD Moving Br. at 58.

The HLD Companies also argued in their moving brief that, even though Commerce cites a rise in imports of HRS exported from China to Brunei and the Philippines, Commerce has not shown what percentage of any of this increase was intended for supply to the OCTG industry. *Id.* at 58.  HRS has a variety of uses, and it lies within the domain and sovereignty of foreign governments to regulate their trade with one another.  The Philippines has overall increased its industrial productivity, and the steel industry has become an important part of the Philippine economy.  The Philippines, however, has no integrated steel mills that produce HRS, so that this raw material must be imported, not only for pipes and tubes, but for construction, manufacture of machinery and household goods, and hardware.

Regarding affiliation, as discussed above, no HLD affiliate is a

33

Chinese integrated steel mill producing HRS, and neither of the HLD companies purchased HRS from affiliates seeking to move finishing operations across borders.  Rather, the HLD Companies' Chinese affiliates, like HLD Clark and HLDSB, produce OCTG and purchase HRS as an input for their pipe production from unaffiliated steel mills. *See* Clark Questionnaire Response (March 16, 2021) ("HLD Clark Qre Rsp.") at 1-2, 5-11, 28-29 & Ex. 1.1; **Appx02209-02210, Appx02213-02219, Appx02236-02237 & Appx02244-02247.**  HLDSB Questionnaire Response (March 16, 2021) ("HLDS Qre Rsp.") at 1-2, 4-11, 28-29 & Ex. 1.1, **Appx01554-01555, App01557-01564, Appx01581-01582 & Appx01589-01594.**

Thus, none of the factors listed in 19 U.S.C. § 1677j(b)(3)(A)-(C) are decisive for Commerce's conclusion that a finding of circumvention in this case is appropriate.

## V.   Conclusion

Accordingly, Commerce's findings that the HLD Companies' manufacture of OCTG was circumventing the AD/CVD Orders on OCTG was not justified or reasonable and not supported by record evidence.

Commerce's comparisons were inappropriate and failed to consider important aspects of the problem, including whether the HLD companies could fairly be characterized as engaged in mere assembly or completion of HRS into OCTG.  The Court should therefore remand this case to Commerce with instructions to find that the HLD Companies did not circumvent the AD/CVD Orders on OCTG from China.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman*
Vivien J. Wang**
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel:   (202) 783-6900
Date:  September 26, 2022        email: gmenegaz@dhlaw.com
*Counsel for Plaintiffs*

---

* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

** Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (14-point Century font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **6,423** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

_____

Gregory S. Menegaz
DeKieffer & Horgan, PLLC
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs HLDS (B) Steel Sdn Bhd and HLD Clark Steel Pipe Co., Inc.*